Virginia ARMISTEAD, et al., Plaintiffs–
Appellees, Cross–Appellants,

v.

VERNITRON CORPORATION; AIE—Di-
vision of Vernitron Group Insurance
Plan, Defendants–Appellants, Cross–
Appellees.

Nos. 89–6405, 89–6406.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 25, 1991.

Decided Sept. 24, 1991.

Rehearing and Rehearing En Banc
Denied Nov. 5, 1991.

James G. Stranch, III, Branstetter, Kilgore, Stranch & Jennings, Nashville, Tenn., William T. Payne (argued and briefed), Schwartz, Steinsapir, Dohrmann & Sommers, Los Angeles, Cal., Franklin G. Shuler, Jr., Birmingham, Ala., for plaintiffs-appellees cross-appellants.

Douglas R. Pierce, Kenneth E. Douthat, King & Ballow, Nashville, Tenn., Harrison C. Thompson, Jr., Thomas M. Gonzalez (argued), Ronald W. Fraley (briefed), Thompson, Sizemore & Gonzalez, Tampa, Fla., for defendants-appellants cross-appellees.

Cathy Ventrell–Monsees, Washington, D.C., for the American Ass'n of Retired Persons (AARP), amicus curiae.

Before GUY and BOGGS, Circuit Judges, and BERTELSMAN *, District Judge.

* The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

BOGGS, Circuit Judge.

Plaintiffs are a class of thirty-three persons formerly employed at the Nashville, Tennessee plant of Aladdin Industries Electronics Division ("AIED"), a subsidiary of defendant Vernitron Corporation ("Vernitron"). They are represented by the United Steel Workers, AFL–CIO–CLC ("United Steel Workers" or "the union"). When Vernitron decided to close the AIED plant in Nashville, Tennessee, plaintiffs elected to retire. In this suit, they invoke the jurisdiction of the Labor–Management Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA") to allege that Vernitron has wrongfully failed to provide them with retiree health and life insurance benefits, thereby violating the collective bargaining agreement ("CBA") with the union and breaching the terms of a retirement benefit plan established pursuant to the CBA. *See* LMRA § 301(a), 29 U.S.C. § 185(a); ERISA §§ 502(a)(1)(B), (a)(3), (e) & (f), 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e) & (f).

The district court held for the plaintiffs, finding Vernitron in violation of the CBA and the retirement benefit plan. The court further held that Vernitron was equitably estopped from denying the plaintiffs retiree insurance benefits. The plaintiffs were awarded compensatory damages for insurance and medical expenses they had already incurred and were granted an injunction requiring Vernitron to provide lifetime health and life insurance benefits. Plaintiffs' request for attorneys fees was denied.

Vernitron now appeals the judgment in plaintiffs' favor. Plaintiffs cross-appeal the denial of attorneys fees. The American Association of Retired Persons ("AARP") is before the court as *amicus* to support the cross-appeal. We affirm the judgment of the district court in all respects.

I

Prior to October 1979, the Nashville plant where plaintiffs worked was owned by Aladdin Industries ("Aladdin"). On that date, the plant was purchased by Vernitron and subsequently renamed the Aladdin Industries Electronics Division. Shortly before the sale, in May 1979, Aladdin employees were organized by the United Steel Workers. On August 25, 1987, after Vernitron underwent a leveraged buyout, Vernitron announced that it would close the Nashville plant on November 20, 1987 and move its operations to another location where labor was less costly. Plaintiffs, who were eligible for early retirement, planned to retire on the day the plant closed. When they made this decision, they believed that they were entitled to lifetime medical and life insurance benefits in retirement. However, on the day the plant shut down, plaintiffs were informed by Vernitron officials that they would not be receiving retirement insurance benefits.

Vernitron contends that under the provisions of the collective bargaining agreement and the employee benefit plan it had purchased from Massachusetts Mutual Insurance Company ("Massachusetts Mutual"), it had the right to terminate unilaterally plaintiffs' eligibility for retiree insurance benefits. The plaintiffs deny that Vernitron has any such right. This is the sum and substance of the dispute between the parties in this case. Both sides base their positions on a series of documents containing the terms of AIED's benefits plan. Following the arguments of the parties will require a road map through the maze of CBAs, group insurance plans, and plan booklets on which the parties rely.

A. The Documents

1. *"Your Aladdin Benefits."* Before the Nashville plant was organized by the United Steel Workers, plaintiffs were eligible for retirement benefits under a plan Alladin had set up voluntarily. The terms of the benefits plan were set forth in a booklet entitled "Your Aladdin Benefits." The plan provided life and health insurance benefits to active employees and pension benefits to retirees. It also provided that employees retiring between ages 50 to 65 and their eligible dependents were to receive the same medical insurance coverage as active employees and twenty-five per-

cent of their life insurance protection. The booklet also contained the following language reserving to Aladdin the right to terminate or modify the plan:

Aladdin Industries, Inc. expects to continue the plan indefinitely, but the company must reserve the right to amend or terminate it, or to change the method of providing benefits.

In the final analysis, Vernitron relies on this passage to assert its alleged right to terminate the plaintiffs' retirement insurance benefits unilaterally.

2. *Article XV of the 1979 Collective Bargaining Agreement.* After unionization, Aladdin and the union negotiated a CBA. It took effect May 8, 1979, some six months before Aladdin sold its Nashville plant to Vernitron. Article XV of the CBA provided, in pertinent part, as follows:

1. The Company agrees to continue to provide an opportunity for eligible employees and dependents to participate in the present group health insurance plan as amended, all as set out in the booklet, "Your Aladdin Benefits," provided that the percentage of participants is sufficient to justify the continuance of the plan....

2. The Company agrees to provide each eligible employee Life, Accidental Death and Dismemberment, and Sick and Accident Insurance, as outlined in the above mentioned booklet....

3. *The Massachusetts Mutual Plan (or the "Group Insurance Plan") and booklet.* During this period of time, Leon Candella was hired as the company's personnel director. He did not negotiate the 1979 CBA, but he was responsible for implementing its terms and served as the company's representative to the union. After Vernitron bought Aladdin's Nashville plant, Candella continued in this position until he was laid off in February 1986, more than eighteen months before the shut-down. The purchase agreement between Vernitron and Aladdin required Vernitron to accept the CBA then in effect. Consistent with this obligation, Vernitron requested its insurer, Massachusetts Mutual, to replicate the insurance package in effect when Aladdin owned the plant. Retiree insurance benefits were to be included in the replicated package.

Candella flew to New York to oversee the preparation of a group insurance booklet containing the provisions of the group insurance plan. The plan booklet omitted the language from "Your Aladdin Handbook" reserving to the employer the right to amend or terminate the plan. Nonetheless, Candella testified at trial that it was the intention of Vernitron to continue the same insurance benefits that were previously offered. He also testified that any differences between the benefits or conditions described in "Your Aladdin Benefits" and the group plan booklet was the result of an oversight.

The policy, not the plan booklet, also contained the following language:

Your coverage under each type of [p]ersonal [i]nsurance and [d]ependent [i]nsurance will cease on the earliest to occur of the following dates:

. . . .

2. The date you are no longer eligible for that type of insurance ... because you have become a member of an ineligible group of employees....

4. The date you cease active work in the employ of the Policyholder except that ...

b. if such cessation is due to retirement, any type of insurance specified in the Schedule of Insurance as applicable to you during retirement shall be continued subject to the terms of the Group Policy.

4. *The 1982 Collective Bargaining Agreement and Plan Booklet.* In 1982, the union and Vernitron entered into a second CBA. For the first time, they actively negotiated over benefits. Although some changes were made in benefits available to active employees, no changes in the coverage for retired employees were discussed. Article XV of the 1979 Agreement was not altered in any appreciable sense. The only changes relevant to this action were that a reference to the plan booklet, "AIE–Division of Vernitron Group Insurance Plan Booklet," was substituted for a reference

to "Your Aladdin Benefits" in section 1 of Article XV and a reference to the Aladdin booklet was deleted in section 2 of that article.

Each employee who retired under the terms of the 1982 agreement received retiree health and life insurance benefits and continues to receive them, even though the agreement has expired.

5. *The 1985 Collective Bargaining Agreement and Plan Booklet.* The second, and last, CBA negotiated by Vernitron and the union took effect in May 1985. The parties discussed the issue of insurance, and some changes were made with respect to the health insurance benefits available to the employees. Although there were no specific negotiations regarding the benefits available to retirees, the changes that were made with regard to insurance for active employees applied to them as well. Article XV of the 1985 agreement remained the same as Article XV of the 1982 CBA.

A new plan booklet was issued after the negotiations were concluded. All reference to retiree health and life insurance benefits were deleted from this publication. Nonetheless, Candella, who handled the negotiations for Vernitron, testified that the omissions were an oversight. Vernitron has stipulated to this effect. Candella also testified that, as chief negotiator of the 1982 and 1985 agreements, it was his understanding that these benefits would continue for the life of the retirees. With the exception of the plaintiffs, employees who retired after the 1985 agreement and plan booklet were implemented continue to receive retiree life and health benefits.

## B. The Shut Down

When Vernitron announced the plant closing, a number of AIED's more senior employees considered the option of early retirement. Although the consequence of this choice would be a reduced pension, the prospect of lifetime health and life insurance benefits in retirement made up for it. Therefore, it became a matter of keen interest to these employees whether they would receive retirement insurance benefits, as previous retirees had. Durelle Henry, who had replaced Candella as AIED's personnel manager, wrote to Vernitron's corporate headquarters asking about the status of retiree benefits after the plant closing and requesting a statement of the "present benefits" for retirees. Subsequently, Henry sent a list of employees eligible for retirement to corporate headquarters so that the cost of retiree benefits could be calculated.

Headquarters was not prompt in responding to Henry's inquiries. The question of the eligibility for retirement benefits of those retiring with the plant closing was posed to John Slowick, Vernitron's "chief operating officer" at a meeting of company officials. He answered, "COBRA." Apparently he was referring to the Comprehensive Budget Reconciliation Act of 1985, Pub.L. No. 99–272, 100 Stat. 222 (1986) (codified at 29 U.S.C. §§ 1161–68). COBRA obliges Vernitron to provide continued health care coverage under its group health plan for a limited time to any employee, not just a retiree, terminated because of the plant closing. *See* 29 U.S.C. §§ 1161–63. As it turns out, Vernitron acknowledged no other duty to provide retirees with retiree insurance benefits except its COBRA obligation.

Vernitron's position was not communicated to Henry until November 20, the day the plant shut down. In the interval between Henry's letter to Vernitron's headquarters and the shut-down, Henry advised senior employees thinking about retirement to wait until the plant closed before retiring. Henry believed that by waiting, the employees would be eligible for unemployment compensation as well as pension and insurance benefits. Not every employee who qualified for early retirement took this advice. From the date the plant closing was announced until it actually closed, a number of AIED employees retired. They received pension benefits, reduced in consideration of early retirement, and life and medical insurance benefits. They continue to receive these benefits to this day. Their entitlement to them is not an issue in this suit.

Plaintiffs, however, waited until November 20 to retire. They were then informed that the company's position was that they were not entitled to retiree insurance benefits. (Their right to pension benefits is not an issue in this case). The parties have stipulated that with one or two exceptions, plaintiffs would not have retired had they known that they would not be receiving insurance benefits in retirement.[1] When they were informed of Vernitron's position, plaintiffs attempted to rescind their decision to retire, but they were told that it was too late for them to do so, since they had already filed the necessary papers. Plaintiffs then turned to the grievance procedures of the CBA to compel a recognition of their asserted right to retirement insurance benefits. When that approach failed to provide relief, they filed this action in federal district court under the LMRA and ERISA.

## II

 The LMRA § 301(a), 29 U.S.C. § 185(a), extends the jurisdiction of the federal courts to cases involving alleged breaches of collective bargaining agreements. The enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation as long as their application is not inconsistent with federal labor policy. *International Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983). When disputes arise, courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties. *Ibid.* The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion. *Ibid.* If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. *Id.* at 1479–80. As in all contracts, the terms of a collective bargaining agreement should be construed so as to render none nugatory and to avoid illusory promises. *Id.* at 1480. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. *Ibid.*

 Applying these principles to this case, the district court found that it was the intent of the parties under the 1985 CBA to provide lifetime retiree insurance benefits and that such benefits were not unilaterally terminable. The court began by considering the implications of the omission of any reference to retiree insurance benefits from the benefits plan booklet published pursuant to the 1985 CBA. According to the court, Candella's testimony had established that if a subject covered in an expiring CBA was not discussed during negotiations, the parties intended that provisions relating to that subject be carried over into the new agreement as if fully discussed and agreed upon. Therefore, the court found that the omission of any reference to retiree insurance benefits from the 1985 plan booklet was mere oversight and not indicative of any intention to cancel the life and health insurance program for retirees.

This settled, the court turned to the question of whether the parties had agreed that Vernitron should have the right to terminate the retirement insurance program unilaterally. The court began by characterizing plaintiffs' retirement insurance benefits as " 'status benefits' which carry with them an inference that they continue as long as the prerequisite status is maintained." This approach to the question of the parties' intention is drawn from *Yard–Man, supra.* In that case, retirees

---

1. We are not told what the plaintiff would have done if they did not retire. The tacit assumption of the facts as set forth by both parties is that plaintiffs had vested pension rights that they could call on immediately or wait until they reached sixty-five to use. We infer that if they chose to wait, they would have to find some other source of income, since they would have no pension. We are not told what other sources of income they had at their disposal. In any event, the parties have stipulated that plaintiffs would not have retired had they known they would be ineligible for insurance benefits. The truth of this assertion is not an issue in this case.

were claiming retirement insurance benefits under a CBA that had expired. Their former employer maintained that their entitlement to benefits had expired when the CBA did. This court held that parties to a CBA may provide for rights that survive the termination of their collective bargaining agreement. *Yard–Man*, 716 F.2d at 1479. Whether or not they do so is not settled by statute, but is a question of contract interpretation. *Ibid.; Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1516 (8th Cir.1988). Retiree status benefits are not necessarily indeterminable by nature; the question depends on the intention of the parties. *Yard–Man, ibid.* Nonetheless, the *Yard–Man* court reasoned that the context in which retirement insurance benefits are negotiated gives rise to an inference that they are intended to be life-long. According to the court,

> [b]enefits for retirees are only permissive not mandatory subjects of collective bargaining.... As such, it is unlikely that [these] benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.... The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements....
>
> Further, retiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.

*Id.* at 1482 (citations omitted). But see *Anderson v. Alpha Portland Indus.*, 836 F.2d 1512 at 1517 (inference does not shift burden of proof to defendant to show benefits have not vested); *International Un-*

*ion, United Auto., Aerospace, and Agric. Implement Workers of America v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir.1984) ("[T]here is no legal presumption based on the status of retired employees.").

In deciding this case, the court below relied on *Yard–Man* to draw an inference that the parties had intended retirement benefits to vest. The court also relied on additional evidence to confirm the inference and to find that the parties had not intended to reserve to Vernitron the right to terminate retirement insurance benefits unilaterally. The evidence on which the court relied was: 1) the testimony of Candella that he implemented the agreement between the parties with the belief that retiree benefits were lifetime benefits; 2) the actions of Vernitron management officials who told plaintiffs that they would receive retiree benefits; 3) the actions of Henry in advising plaintiffs to retire after the plant shut-down so that they would receive unemployment benefits as well as their retiree benefits and their pensions; and 4) the actions of Vernitron itself in continuing to provide retiree benefits to those persons who retired prior to the plant shut-down.

■ Vernitron begins its attack on the district court's judgment by arguing that the court violated the parole evidence rule when it considered extrinsic evidence in determining that the parties intended to provide retiree insurance benefits in the 1985 CBA and plan booklet. Although Vernitron has stipulated that omitting provisions for retiree insurance benefits from the plan booklet was an oversight, it argues that the plan booklet was "unambiguous" in its failure to provide such benefits. Therefore, Vernitron asserts, the district court erred in considering evidence extrinsic to the CBA and resulting plan booklet in determining what the parties intended in the 1985 negotiations and "reforming" the plan booklet accordingly.

■ This argument shows considerable confusion about the parol evidence rule. The question of the admissibility of parol

evidence arises in three different areas of contract law: 1) when a party seeks to introduce inconsistent terms to vary the terms of a *writing* intended to be an integrated expression of their *agreement; see generally* Restatement (Second) of Contracts §§ 209–212 (1983); 2) when a party seeks to demonstrate that a term is ambiguous and to interpret the allegedly ambiguous term; *see generally id.* §§ 212(2), 214(c); and 3) when a party seeks to reform a *writing* on the grounds that it does not embody the *agreement* of the parties because of mistake; *see generally id.* § 214(d). In the first two cases, the parole evidence rule presents a number of difficult questions. We need not deal with them here because the issue raised by the 1985 plan booklet is not one of inconsistent or ambiguous terms. The plaintiffs in this case are asking for the reformation of the 1985 plan booklet on the grounds that it does not reflect their *agreement* with Vernitron. Evidence extrinsic to the writing is always admissible to show that there has been a mistake in reducing the agreement of the parties to writing. *Prudential Ins. Co. of America v. Strickland*, 187 F.2d 67, 70 (6th Cir.1951) (interpreting Tennessee law in a diversity case); *Rentenbach Eng'g Co., Constr. Div. v. General Realty, Ltd.*, 707 S.W.2d 524, 526, 528–29 (Tenn.Ct.App. 1986) (collecting cases from other jurisdictions). A party seeking reformation must show that it is entitled to it by clear and convincing evidence, *Rentenbach*, 707 S.W.2d at 527, the ordinary standard in equity. Vernitron's stipulation that omitting retiree insurance benefits from the plan booklet was an oversight establishes that the booklet was mistaken, according to this standard of evidence. This question settled, the district court acted quite properly in considering evidence extrinsic to the plan booklet to determine the actual agreement of the parties.

■ To contradict the district court's determination, Vernitron argues that the language in "Your Aladdin Benefits" reserving to Aladdin the right to terminate benefits unilaterally was preserved in subsequent negotiations. This position is not a strong one, since no such language appears in the 1985 CBA or the plan booklet subsequently published. In fact, this unilateral termination clause had been dropped from the plan booklet after Vernitron bought Aladdin's Nashville plant and sent Candella to New York to arrange a benefits plan with Massachusetts Mutual. To overcome this difficulty, Vernitron devises the "no prior negotiation rule," which it asserts the court used in finding that the parties intended to retain in the 1985 CBA provisions for retiree health insurance benefits agreed to in earlier CBAs. This asserted "rule" states that where the parties to a collective bargaining negotiation do not negotiate over terms found in an expiring CBA, it is their intention to retain those terms unchanged in the new CBA. Vernitron points out that the elimination of the unilateral termination clause found in "Your Aladdin Benefits" was not the subject of negotiations with the union. Therefore, Vernitron concludes, the "no prior negotiation rule" should have compelled the court below to find that the parties intended to include in all subsequent plan booklets the language from "Your Aladdin Benefits" reserving to the employer the right to terminate the entire benefits program unilaterally.

The difficulty with Vernitron's argument is that it attempts to elevate the heuristic premise of the district court's consideration of disputed questions of fact to the level of a rule of law. That premise, that the failure to negotiate over terms of an expiring agreement indicates the parties' intention to retain those terms unchanged in succeeding agreements, cannot be applied universally. As *Yard–Man* teaches, in matters of contract interpretation, courts must look to the context that gives rise to the inclusion of particular language and to the relative positions and purposes of the parties. 716 F.2d at 1479–80. The same is true when courts are considering the significance of the exclusion of particular language. Despite Vernitron's attempt to equate the two, the context in which the 1985 CBA was negotiated was not the same as the context in which the Massachusetts Mutual plan booklet, which dropped the unilateral termination clause,

was issued. The 1985 CBA negotiation was an event in the continuing representation of AIED employees by the United Steel Workers. In the context of this ongoing relationship, it is entirely reasonable to infer that the terms of expiring CBAs would continue unchanged in subsequent CBA, unless those terms were brought to the table for discussion. On the other hand, the Massachusetts Mutual plan booklet was issued in the context of a pervasive reformation of the relationship between employer and employee.[2] The Nashville plant had recently been organized by a union. Terms and conditions of employment, which had previously been determined by the employer at its discretion, were thereafter to be regulated by binding agreements. It would be completely inconsistent with this change in "the relative positions" of the parties and the purpose of unionization to infer that failure to discuss abrogation of the unilateral termination clause betokened an intention to preserve it.

■ In addition, reading into the agreement a clause permitting Vernitron to terminate all benefits programs, not just retiree insurance benefits, would render illusory Vernitron's promise to provide these benefits. In effect, Vernitron has claimed—indeed, it has attempted to exercise with respect to retiree benefits—a unilateral power to terminate the entire benefits plan without so much as even giving notice to the plaintiffs that they were doing so. It is a settled principle of traditional contract law that a provision permitting the

termination of the contract by one party at will renders the contract illusory, while a provision for termination after notice for a fixed period does not have that effect. *Phalanx Air Freight, Inc. v. National Skyway Freight Corp.*, 104 Cal.App.2d 771, 772, 232 P.2d 510, 512 (1951); *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo.Ct.App.1986) ("To construe the Plan, as [defendant employer does,] to empower the employer to terminate the benefits of an employee-promisee at will and without notice, is to invent a term which lacks mutuality of obligation, is illusory, and unenforceable."); Corbin on Contracts § 163 at 237 (1952) ("If a promisor reserves the power to cancel at any time without notice, his promise seems to be unenforceable, at least as long as there has been no performance by the other party to the agreement. While still wholly executory, the promisor is not bound by the reason that he can cancel without notice by merely willing to do so; and the other party's promise is not binding for lack of consideration.").

Vernitron's next argument relies on the language of paragraphs 1 and 2 of Article XV of the CBA and corresponding language of the Massachusetts Mutual policy, which we have quoted above. In effect, both the CBA and the policy state that insurance benefits will be provided to "eligible" employees. Vernitron argues that the plaintiffs became ineligible for retiree insurance benefits because Vernitron had cancelled that program just before the plaintiffs retired. Plainly this argument is

---

**2.** The language of Article XV of the CBA reflects this change in the relative position of the parties with respect to Vernitron's obligation to provide benefits. The Aladdin booklet "reserve[d to the company] the right to amend or terminate [the plan], or to change the method of providing benefits." Article XV reads: "The [c]ompany agrees to provide [a group health insurance plan], provided that the percentage of participants is sufficient to justify the continuance of the plan." Under the pre-unionization Aladdin booklet, the company's right to terminate benefits was unqualified. Article XV of the CBA restricts the right of termination considerably, in effect limiting its exercise to situations in which continuation of the benefit plan is no longer feasible financially because the number of participants in the plan is too small to justify

it. This is a significant limitation on Vernitron's rights and inconsistent with Vernitron's position that nothing in the 1979 negotiations indicates an intention to preserve unaltered the company's right of unilateral termination found in the Aladdin booklet. We note that the 1979 CBA simultaneously limits the company's right to terminate benefits while the Aladdin booklet, to which the CBA refers, reserves to Vernitron an unlimited right of termination. This creates an "ambiguity" in the terms of the contract, which might require parol evidence to interpret. We are spared this inquiry because the parties have not chosen to litigate this issue. Were they to do so, we would probably take the facts and circumstances of the post-unionization negotiations in 1979 as an indication of an intention to limit severely Vernitron's right of termination.

just another way of claiming that Vernitron had the right to terminate the retirement insurance program unilaterally. It must fail for the same reason that Vernitron's previous argument failed. If Vernitron had the right to terminate the insurance program unilaterally and without notice, its promise to provide retirement insurance benefits under the CBA would be illusory.

 Vernitron next contends that under the Massachusetts policy quoted above, only employees who cease working for the company due to retirement are eligible for retirement benefits. Vernitron asserts that plaintiffs' employment was terminated due to the plant closing, not retirement; therefore, they are ineligible. This position is without merit. There is no dispute that the plaintiffs were eligible for the retirement when the plant closing was announced. They chose to exercise their right to retire precisely in order to avoid termination in the shut-down. They may have retired in anticipation of the shut-down, but they did terminate their employment by retiring.

Finally Vernitron contends that the district court erred in its reliance on *Yard–Man*. According to Vernitron, the *Yard–Man* inference, discussed above, deals with the question of whether retirement benefits, once conferred, vest in retirees. The issue in this case, Vernitron asserts, is whether benefits have been conferred. Vernitron argues that the court should not have reached the question of vesting without first settling the issue of whether the insurance benefits had been conferred. Vernitron's position is that benefits had not been conferred, because it had cancelled the insurance program for retirees.

Vernitron is correct in suggesting that the issues in *Yard–Man* and in this case are distinguishable. Nonetheless, the distinction between the two cases does not subtract from *Yard–Man*'s relevance to this suit. A basic premise of *Yard–Man*, that retirement insurance benefits are a form of deferred compensation, applies equally to this case. Because these benefits are deferred compensation, it is unrea-

sonable to suppose that the parties to the CBA intended to permit Vernitron to terminate the retirement insurance program unilaterally.

 In view of the foregoing, we hold that the district court did not err in finding that the parties intended to continue in the 1985 CBA the retirement insurance program that had been agreed to in past CBAs. We further hold that the district court did not err holding that Vernitron had no right under the 1985 CBA to terminate the retirement insurance program unilaterally. Accordingly, we affirm the judgment reached under the LMRA.

### III

 We must next consider whether plaintiffs have stated a claim under ERISA. The court below, at the suggestion of the plaintiffs, relied on *In re White Farm Equipment Co. (Hansen v. White Motor Corp.)*, 788 F.2d 1186 (6th Cir.1986) to find an ERISA violation. In that case, the successor in bankruptcy to the retiree plaintiffs' former employer had attempted to terminate the medical insurance benefits that the plaintiffs had already been enjoying for some time. Unlike this case, however, the retirees were not represented by a union when they were employed. Their former employer had extended insurance benefits to them voluntarily. No CBA was involved, and the LMRA was not implicated. The issue in the case was whether retirees had vested rights in a group insurance plan.

ERISA divides benefit plans into two classes: "welfare benefit plans" and "pension plans." *See* 29 U.S.C. §§ 1002(1) & (2)(A). The group insurance plan in *White Farm* and the one at issue here are welfare benefits plans. *White Farm*, 788 F.2d at 1187; *Musto v. American General Corp.*, 861 F.2d 897, 901 n. 2 (6th Cir.1988). Pension plans are subject to statutory vesting requirements, 29 U.S.C. § 1053, but welfare plans are not. The question the *White Farm* court decided was whether welfare benefits had vested at retirement as a matter of federal common law under ERISA.

The court declined to adopt a *per se* rule to that effect. Instead, it held that whether plaintiffs' rights to welfare benefits had vested was determined by the intention of the parties. *White Farm*, 788 F.2d at 1192–93. The case was remanded for a determination of that intention.

As the court below in this case observed, *White Farm* leaves open the question of whether a breach of a CBA, which includes provisions for vested retirement benefits, constitutes a violation of ERISA. The court below concluded that it did, reasoning that a medical insurance plan established pursuant to a CBA came within the definition of a welfare benefit plan under ERISA. From this proposition, it follows that if it is the intention of the parties to confer on retirees vested rights in medical insurance benefits under a CBA, it is also their intention to confer the same rights under the "welfare benefit plan" protected by ERISA. Therefore, the court below concluded, Vernitron's breach of contract of LMRA § 301 also constituted a violation of ERISA.

In general, we find no fault in the court's treatment of this question. However, in our own discussion of plaintiffs' LMRA claim, we pointed out that the issue in this case is not whether plaintiffs have vested rights to insurance benefits they were already enjoying, but whether Vernitron had the right to prevent these benefits from being conferred by terminating the insurance program. Nonetheless, we come to the same conclusion as the district court did in deciding whether Vernitron violated ERISA. The medical insurance plan agreed to in the CBA is a welfare benefits plan under ERISA. The terms of the benefits plan are established in the CBA. Having concluded that Vernitron had no right to terminate plaintiffs' insurance benefits under the CBA, we must also conclude that it had no right to terminate them when we consider the terms of the CBA as a benefits plan under ERISA. We therefore affirm the judgment of the district court that Vernitron's breach of contract under LMRA § 301 was also a violation of ERISA.

## IV

We shall now consider the issues raised by the district court's holding that Vernitron was equitably estopped from denying plaintiffs retirement insurance benefits.

Both the LMRA and ERISA authorize the federal courts to fashion a body of federal common law to enforce the agreement that these statutes bring within their jurisdiction. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988). In *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.1987), this circuit incorporated the doctrine of equitable estoppel into the federal common law of contracts, at least in so far as the agreement at issue is before the federal courts under the LMRA. The elements of equitable estoppel are:

1) conduct or language amounting to a representation of material fact;

2) awareness of the true facts by the party to be estopped;

3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;

4) unawareness of the true facts by the party asserting the estoppel; and

5) detrimental and justifiable reliance by the party asserting the estoppel on the representation.

*Ibid.*

The district court held Vernitron equitably estopped from denying plaintiffs retirement insurance benefits because it found that various officials at the Nashville plant had represented to plaintiffs that they would be receiving insurance benefits in retirement. In reliance on these representations, the court concluded, plaintiffs had acted to their detriment by electing to retire early.

Vernitron advances two arguments to contest this conclusion. The first is addressed to the facts. Vernitron argues that Slowick, who made the decision to

deny plaintiffs insurance benefits, did not make this determination until the day the plant shut down. Hence, says Vernitron, when it told the plaintiffs, through its officials in Nashville, that they would be receiving insurance benefits, it did not know the truth of the matter, which was that Slowick would decide to terminate the retirement insurance program as it related to the plaintiffs. This "truth" only became true when Slowick made his decision contemporaneously with the plant shut-down, according to Vernitron. Hence, Vernitron asserts, plaintiffs' case does not meet the second element of equitable estoppel.

This argument displays some ingenuity, but it must be rejected nonetheless. The "true fact" of which Slowick was aware, but plaintiffs were not, was that Vernitron's corporate headquarters believed that it had the right to terminate the retirement insurance plan with respect to the plaintiffs. Had plaintiffs known this they might have acted differently. For instance, they might have sought a declaratory judgment settling the issue, or they might have retired before the date of the plant shut-down, as other employees had done. They did not do so, thereby acting to their detriment—or at least failing to act to their advantage—because of what they had been told by Vernitron officials.

Vernitron's second argument against being estopped from denying insurance benefits is that ERISA's requirement that a welfare plan be in writing precludes the application of equitable estoppel in ERISA cases. *See* 29 U.S.C. § 1102(a)(1). Vernitron relies on *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986), which held that employee benefit plans governed by ERISA must necessarily be in writing and therefore may not be modified by oral agreement. In that case, plaintiff's deceased husband was a participant in a written pension plan established by his law firm. The plan specified that the value of his share was to be determined as of the date of his withdrawal from participation. Plaintiff, however, objected to the evaluation, claiming that her deceased husband had an oral agreement with the plan's trustees to evaluate his share at a later, more favorable date. She maintained that "the trustees of the ... [p]lan ... [were] estopped from enforcing the written terms of the [plan] by the ... oral agreement with her husband to employ [the more favorable evaluation date]." *Id.* at 958.

The *Nachwalter* court rejected the plaintiff's request to "create a common law doctrine of estoppel which permits oral modification of ERISA-protected plans." *Id.* at 959. The court cogently reasoned that if oral modifications were permitted, the rights of other plan participants would be jeopardized by unrecorded oral agreements between plan officers and favored plan participants. *Id.* at 960. In such circumstances, "employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements." *Ibid.* In sum, permitting oral modification of pension plans would undermine the security of pension rights, the goal Congress sought to serve by requiring that they be put in writing.

Vernitron urges this court to equate the district court's application of equitable estoppel in this case to the oral modification of a written pension plan, which the *Nachwalter* court held impermissible under ERISA. Before addressing the substance of Vernitron's argument, a few preliminary technical observations are in order.

A contract is modified when the parties agree to a change in its terms. *See generally* 17A C.J.S. *Contracts* § 373 (1963). Equitable estoppel, on the other hand, precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel. *See generally* 31 C.J.S. *Estoppel* § 1 (1964). In this case, plaintiffs are not alleging that Vernitron agreed not to terminate plaintiffs' rights. Rather they are alleging that Vernitron may not exercise its asserted right of unilateral termination because of the misleading representations of Vernitron's agents. Of course, plaintiffs' assertion of estoppel and Vernitron's answer to it presuppose a claim that the

court below and this court have previously rejected, that Vernitron had the right to terminate plaintiffs' insurance benefits unilaterally. For the sake of argument, we shall continue this assumption in order to provide complete review of the district court's judgment.

The substance of the *Nachwalter* court's opinion is that Congress's purpose in requiring that benefit plans be in writing can only be served if the plan is enforced as written. When a party is estopped from asserting a right in a written plan, the plan as enforced is not the same as the plan as written. For this reason, ERISA would seem to preclude application of equitable estoppel to disputes over benefit plans under the statute.

This reasoning applies primarily to cases involving pension plans and is much less cogent when welfare benefit plans are at issue. The reason is that pension benefits are typically paid out of funds to which both employers and employee contribute. Contributions and pay-outs are determined by actuarial assumptions reflected in the terms of the plan. If the effective terms of the plan may be altered by transactions between officers of the plan and individual plan participants or discrete groups of them, the rights and legitimate expectations of third parties to retirement income may be prejudiced.

This is not necessarily the case with insurance benefit plans. Typically the employer pays policy premiums out of its own assets, perhaps with a contribution from the employee. The actuarial soundness of a fund, which might be depleted if strict vesting and accrual requirements were not observed, is not an issue where a plan of this description is involved. We conclude therefore that in such a case, the purpose of Congress in enacting 29 U.S.C. § 1102(a) would not be frustrated by recourse to estoppel principles, which are generally applicable to all legal actions.

We note that this line of reasoning has recently been followed by the Seventh Circuit in *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990). In that case, the issue was whether a bankrupt employer would be estopped from denying severance pay benefits. After noting the reluctance of courts to apply equitable estoppel to ERISA cases, the court held:

> The reason ordinarily cited for this reluctance ... is a concern for the actuarial soundness of the ERISA plan. There are two types of ERISA plans: pension plans, which are funded and have strict vesting and accrual requirements; and welfare plans such as the one involved in this case, which have no such requirements. In the case of an unfunded welfare plan, there is no particular fund that is depleted by paying benefits. Thus there is no need for concern about the plan's actuarial soundness.
>
> [It has been noted that where] estoppel is disallowed, the pension plan involved is ordinarily a multi-employer plan. S. Bruce, Pension Claims: Rights and Obligations 404 (1988). The reason for reluctance in such cases is the fact that the plan has multiple fiduciaries with control over a common fund. To allow one employer to bind the fund to pay benefits outside the strict terms of the [p]lan would be to make all the employers pay for one employer's misrepresentations, and to the extent that such payments damage the actuarial soundness of the [p]lan, it hurts all the employees as well.

*Id.* at 115.

In this case, there is no fund from which retiree insurance benefits are drawn, because the issue here is Vernitron's obligation to pay health and life insurance premiums, not to maintain a fund from which retirees or their dependents are compensated in the event of death or illness. We conclude that in these circumstances, estoppel principles are applicable. We express no opinion as to the application of estoppel principles to other situations.[3]

---

**3.** We note in passing that the reformation of written instruments is also a form of equitable relief that entails the enforcement of agreements otherwise than as written. Hence the objections to equitable estoppel considered here could also be made to the district court's reformation of the plan booklet, which we upheld above. Had these objections been made, they

## V

We now turn to the final issue in this appeal, the district court's denial of plaintiffs' motion for attorney's fees.

In an ERISA action by a plan participant, beneficiary, or fiduciary, the trial court, at its discretion, may award a reasonable attorney's fee to either party. ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1). This court has held that in exercising its discretion, a trial court should consider the following factors:

(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Secretary of Dep't of Labor v. King,* 775 F.2d 666, 669 (6th Cir.1985).

The district court in this case considered only the first factor and found that when Slowick made the decision to deny retiree insurance benefits to the plaintiffs, he had only the plan booklet to consult. The booklet made no reference to retiree insurance benefits. The court concluded that reliance on the booklet could not be characterized as bad faith. To justify not considering the remaining factors, the district court opined that fee shifting under ERISA is intended to be primarily punitive; hence, the court said, fees should be awarded only if there is a showing of bad faith by one of the parties.

The plaintiffs advance two arguments against this decision. First, they insist that Vernitron did act in bad faith in terminating benefits. Second, they argue that the district court abused its discretion in considering only the first of the *King* factors. The AARP, as *amicus*, urges this court to adopt the position of the Ninth Circuit and to hold that as a rule fees ought to be awarded to a prevailing plaintiff in an ERISA action. *See Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984) ("[A] plan participant or beneficiary, if he prevails in his suit under § 1132 to enforce his rights under his plan, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust'." (Citations omitted)).

■ We find no merit in plaintiffs' contention that the trial court erred in finding that Slowick did not act in bad faith. Plaintiffs assert that from the date the decision to close the Nashville plant was taken, Vernitron officials acted deliberately and in concert in order to conceal from the plaintiffs their intention to cancel plaintiffs' insurance benefits. To support this position, plaintiffs recount the facts of the case and at every point assign a deceptive purpose to the conduct of Vernitron officials. The vigor of plaintiffs' assertions cannot conceal the fact that they are mere speculations offering this court no grounds for overturning the district court's finding as clearly erroneous.

Before turning to plaintiffs' second argument, we shall address the position of the AARP. We begin with some preliminary remarks about our understanding of fee-shifting statutes.

■ Under the "American Rule," attorneys fees are not ordinarily recoverable by the opposing party. *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). The federal courts have only a limited power to shift fees in the absence of a federal statute authorizing it. For example, federal courts have the traditional powers of a court of equity to

---

would be answered as we have answered those to estoppel: the plan at issue here is a welfare plan, not a pension plan; neither the rights of third parties nor the actuarial soundness of a fund are affected by reform in equity of the welfare plan at issue. *See Steelworkers Local*

*2341 v. Kales Co.,* 94 Lab.Cas. ¶ 13,600 (E.D.Mich.1982); *Delgrosso v. Spang & Co.,* 769 F.2d 928 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986) (reforming unilaterally-drafted plan that contradicted pension part of CBA).

award fees to a party recovering funds for the benefit of others in addition to himself out of the funds so recovered. *Id.* at 257, 95 S.Ct. at 1621. Outside of these traditional exceptions, the courts have no "roving authority ... to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Id.* at 259, 95 S.Ct. at 1623. In a number of instances, Congress has chosen to rely heavily on private enforcement to implement public policy and has allowed attorney's fees to encourage private litigation. *Id.* at 263, 95 S.Ct. at 1624. The clearest examples of this policy are the civil rights laws, which authorize awarding fees at the court's discretion to the "prevailing party." *See ibid.;* Civil Rights Attorney's Fees Awards Act of 1976 ("Fees Act"), 42 U.S.C. § 1988. Private parties litigating to enforce public policy are termed "private attorneys general." *See Alyeska Pipeline,* 421 U.S. at 241, 95 S.Ct. at 1614. Awarding fees to a prevailing party under the "private attorney general theory" is not within the traditional equitable powers of the federal courts. *Ibid.*

■ In this case, *amicus* urges us, in effect, to put a spin on the five-factor *King* analysis so as to assimilate the fee-awarding provision of ERISA to the "private attorney general" theory of fee shifting. *Amicus* offers us two reasons for taking this course. First, if fees are not shifted to prevailing plaintiffs as a matter of course, employee plaintiffs will have to pay their own fees, thereby effectively reducing their recovery. Second, employees seeking to recover benefits have difficulty bringing cases because of a lack of attorneys willing to take ERISA cases. The problem is especially serious where, as in this case, plaintiffs claim retiree medical insurance benefits. Defendant employers may be enjoined to pay premiums, but plaintiff employees will not receive monetary damages. Nonetheless, they would have to pay attorney's fees out of their limited retirement income. These results, argues *amicus,* are contrary to the intention of Congress, which is "to provide ... participants and beneficiaries with broad remedies for preventing violations...." S.Rep. No. 127,

93d Cong., 1st Sess. 35 (1973), U.S.Code Cong. & Admin.News 1974, pp. 4639, 4871.

*Amicus* offers us *Smith v. CMTA–IAM Pension Trust* as persuasive authority for its position. We decline to follow *amicus* and to hold that the remedial purposes of the ERISA fee-shifting statute can only be achieved by a rule requiring the awarding of fees to a prevailing plaintiff absent special circumstances. The majority opinion in *Smith* likened ERISA to the Civil Rights Act of 1871 and the Labor–Management Reporting and Disclosure Act. We find this analogy unpersuasive. The *Smith* court relied on LMRA cases emphasizing the disparity in resources between union members and union officers as justification for awarding fees to members who challenge the officers for abusing their office and violating the LMRA-protected rights of members. 746 F.2d at 590. Union officers have the treasury of the union and paid union counsel at their disposal, these cases assert, but dissident members do not. *Ibid.* (citing *Hall v. Cole,* 412 U.S. 1, 13, 93 S.Ct. 1943, 1950, 36 L.Ed.2d 702 (1973) ("Not to award counsel fees in cases such as this would be tantamount to repealing the [LMRA] itself by frustrating its basic purpose.... It is difficult for individual members of labor unions to stand up and fight those who are in charge.... Without counsel fees the grant of federal jurisdiction is but a gesture[,] for few union members could avail themselves of it.")). Such a difference in the relative position of the parties will not occur in every ERISA case. In many of them, employee plaintiffs enjoy the support of their union. (This appears to be the case in this suit). In some instances, this may not be so, and it may be proper for the court to consider the relative position of the parties under the *King* factors. Nonetheless, we are not convinced that such cases will occur frequently enough to warrant a rule for leveling a playing field that may be level enough already.

We also believe that turning for guidance to the fee-shifting provisions of the civil rights laws is mistaken. In our judgment, the concurring opinion in *Smith* rep-

resents the better view. In taking issue with the *Smith* majority, Judge Wallace said:

> The majority apparently ... [believes] that, like civil rights laws, ERISA must be liberally construed to further its remedial purpose.... Such an analysis has no limitation, however. Every statutory scheme is "remedial" with respect to at least one of the groups with which it is concerned, and can thus be analogized to the civil rights laws.

*Id.* at 591 (Wallace, J., concurring). Because every statute is in some sense remedial, it does not follow that ERISA's remedial purpose can only be served by treating prevailing plaintiff employees as "private attorneys general." Fees are not shifted for every statutorily-created cause of action. Without a major public impact, a particular dispute becomes merely "private feuding having no general significance" to the public generally. *Ibid.* (quoting *Hall,* 412 U.S. at 16, 93 S.Ct. at 1951 (White, J., dissenting)). This case is certainly a private feud. No great question of public policy is posed by this dispute over the quite ordinary provisions of an employee benefit plan. *Cf. Iron Workers Local No. 277 v. Bowen,* 624 F.2d 1255, 1265 (5th Cir.1980) ("The policies underlying ERISA are certainly important ones, but they simply do not rise to the level of assuring that all citizens are accorded their civil rights."). Because this litigation so patently lacks the public importance of a civil rights suit, it is an apt illustration of our reasons for refusing to adopt the holding of *Smith* and to treat all successful ERISA plaintiffs as private attorneys general, absent some special circumstance.

The foregoing brings us to the final question in this appeal, whether the district court acted improperly in considering only the question of Vernitron's good faith.

Applying the ERISA fee-shifting statute has presented the courts with a difficult jurisprudential problem. To determine what Congress intended to accomplish by authorizing the courts to award attorney's fees requires scrutiny of the legislative history of § 1132(g)(1). *Cf. Smith,* 746 F.2d

at 589. However, no history exists to provide guidance to the courts. *American Communications Assoc. v. Retirement Plan for Employees of RCA Corp.,* 507 F.Supp. 922, 923 (S.D.N.Y.1981). The wording of the statute itself provides the courts with almost unbridled discretion. In order to confine discretion within reasonable bounds, a majority of the courts have adopted the five-factor *King* analysis, which was first advanced by the Tenth Circuit in *Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978). The *Eaves* court has been criticized for failing to explain how it developed the factors or why they should be used. *See generally* Note, *Attorney's Fees Under ERISA: When Is an Award Appropriate?,* 71 Cornell L.Rev. 1037 (1986). The factors themselves have been criticized as superfluous and unconnected with any discernible purposes of ERISA. *See generally ibid.* For example, the first factor appears to be merely a codification of the common law doctrine that permits the courts punish bad faith litigants by requiring them to pay the opposing party's fees. *See Alyeska Pipeline Co.,* 421 U.S. at 258–59, 95 S.Ct. at 1622.

While these criticisms have some limited validity, they lose sight of the forest amid all the trees. The forest in this case is the American Rule, which forms the legal background against which § 1132(g)(1) was enacted. We believe that the broad wording of the statute has the effect of repealing the American Rule in ERISA cases and permitting the federal courts to devise a common law of fee-shifting. In doing so, the courts may take into consideration any of the legitimate, relevant purposes for which fee-shifting has been permitted or proposed, including punishing bad faith litigants, providing the plaintiff with complete relief in appropriate cases, preventing the unjust enrichments of those who benefit from successful litigation, or removing deterrents to meritorious litigation by reducing the disparity between the resources available to the parties. The *King–Eaves* factors, which include many of the traditional reasons for awarding fees, are as good a place as any to begin the development of a common law of fee-shift-

ing under ERISA, even if they do not turn out to be the final word on the subject. The need for further evolution of the law of fee-shifting under ERISA has been implicitly recognized by a number of courts, which have used provisional language in adopting those factors. *E.g., Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir.1980) (courts should consider the *King–Eaves* factors "among others" in deciding whether to award fees under ERISA); *Iron Workers Local No. 277*, 624 F.2d at 1266 (5th Cir.1980) ("[A] court should consider such factors as [those in *Eaves*]. None of these factors is necessarily decisive, and some may not be apropos....").

■ We conclude therefore that the district court strayed from the mark when it asserted that the purpose of fee-shifting under ERISA was primarily punitive. The punishment of bad faith litigants is a legitimate purpose under ERISA, but not the only purpose. *See New York Cent. Teamsters Pension Fund*, 506 F.Supp. 180, 182 (W.D.N.Y.1980) (purpose of fee-shifting under ERISA is to "enable pension claimants to obtain competent counsel and to distribute the economic burden of litigation in a fair manner"); *Carter v. Montgomery Ward & Co.*, 76 F.R.D. 565, 568 (E.D.Tenn. 1977); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir. 1980).

■ Nonetheless, we decline to remand this case for consideration of the other four *King–Eaves* factors. As we read the *King–Eaves* standard for awarding fees, these four factors can be understood in two ways. First, they could be understood as limitations on fee-shifting once the first factor had been considered and bad faith on the part of one of the litigants found. If we read them this way, then remand for further consideration would be pointless, since the court below has already concluded that Vernitron did not act in bad faith and we have affirmed this finding.

Second, the additional four factors could be considered as independent grounds for awarding fees. If we look at the factors in that light, then the issue before us is whether the district court abused its discretion in not considering whether the additional four factors mandated an award of fees. In general, a party asserting an abuse of discretion by a court has the burden of demonstrating it. *See, e.g., Adkins v. United States District Court*, 431 F.2d 859, *cert. denied*, 400 U.S. 921, 91 S.Ct. 181, 27 L.Ed.2d 182 (1970). In this case, plaintiffs have not shown us how consideration of the other four factors would have lead to a different result. The factors which seem to us most relevant to us are the third, fourth, and fifth.

The third factor indicates that the court is to consider the deterrent effect of an award of fees, but we are offered no reason for pursuing a policy of deterrence beyond that which we in effect always pursue when we hold an employer in breach of its agreements.

The fifth factor speaks of the "relative merits of the parties," but Vernitron's position appears no more devoid of merit than that of any other losing litigant.

Finally, the fourth factor indicates that the court below should have considered whether the plaintiffs sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA. This appears to be a codification of the common fund doctrine of the common law. *See Carter, supra.* This doctrine permits the courts to award fees to a party recovering a fund or property for the benefit of others in addition to himself out of the fund or property so recovered. *Alyeska Pipeline*, 421 U.S. at 257, 95 S.Ct. at 1621. If we were to understand the fourth *King–Eaves* factor in this way, then any award of fees would be for the benefit of the named plaintiffs at the expense of the plaintiff class as a whole. The can hardly be the result plaintiffs seek in requesting fees. On the other hand, since we have previously concluded that the ERISA fee-shifting statute removes the traditional re-

strictions of the American Rule from ERISA cases, we might give the fourth *King–Eaves* factor a broader reading. We might conclude that fee awards are proper when, as in this case, there is litigation to establish the rights of a class of plaintiffs under an ERISA-protected plan and the economic situation of the plaintiffs is such that they could not bring suit except for the prospect of fee-shifting. In essence, this was the position that *amicus* proposed that we adopt, with one slight modification. *Amicus* urged us to assume that as a general rule, all ERISA plaintiffs are unable to secure the help of competent attorneys without the prospect of an award of fees.

Although we have declined to do this as a general rule, we can clearly envisage circumstances where fee-shifting would be proper on such grounds. The matter would have to be determined case by case. In this case, however, plaintiffs have made no showing, either here or below, that this suit could not have been brought but for the prospect of fee-shifting, or that the costs of the case are so burdensome that the value of their recovery is taken from them. This being so, we must conclude that they have not shown that the court below abused its discretion in not considering the fourth *King–Eaves* factor. Plaintiffs have offered us nothing that the court below should have considered.

### VI

For the foregoing reasons, the judgment of the district court is AFFIRMED.