Robert **RICHARDS**, Plaintiff,

v.

**GENERAL MOTORS CORPORATION,**
**and General Motors Savings–Stock**
**Purchase Program, Defendants.**

No. 91–CV–10104–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Feb. 21, 1995.

**1494**

Michael J. Forester, Saginaw, MI, for plaintiff.

David M. Davis, Birmingham, MI, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLELAND, District Judge.

#### I. Introduction

A non-jury trial of this case was held on January 17, 18, and 19, 1995. The court now finds in favor of the defendants and against the plaintiff.

Plaintiff was employed by General Motors Corporation ("GM") from June 1965 until he was fired in April 1990. While employed by GM, Plaintiff participated in General Motors Savings–Stock Purchase Program for Salaried Employees in the United States ("S–SPP"). During the relevant time period, the S–SPP permitted employees to transfer, up to four times a year, their assets among the seven asset categories available under the plan—some of which carried guaranteed but low returns, while others provided higher yield and higher risk. GM's asserted reason for terminating Plaintiff's employment is that Plaintiff misused the program by backdating his asset transfer forms in order to benefit from favorable past stock valuations which were not available on the open market. Knowing past valuations permitted Plaintiff to move from higher risk asset categories to guaranteed return asset categories after a downturn in the market without experiencing the effect of the downturn, and to transfer to higher yield asset categories after learning of a market upswing.

A total of 21 GM employees in two locations in the United States[1] regularly backdated asset transfer forms; as a group, they earned approximately $1.4 million through backdating, according to GM's calculations. GM lost a corresponding amount. When GM discovered the practice, it fired the employees involved and froze their S–SPP accounts. GM then reconciled the S–SPP accounts, recovering $84,966.49 from Plaintiff's account.

Plaintiff admits that he backdated the forms to obtain more favorable valuations[2], but asserts that doing so was in no way dishonest or improper. Plaintiff testified that the local plan administrator, Kay Krager, suggested to him the idea of backdating as a legitimate way for him to avoid downturns in the market and make up for missed opportunities. He testified that he and others trusted Krager and relied on her for advice. He maintains that Defendants

---

1. Twelve of the 21 worked in Willow Springs, Illinois, and the remaining nine worked in Bay City, Michigan.

2. Plaintiff testified that he began backdating the forms in August 1987 and backdated each form

thereafter until the termination of his employment in April 1990. GM asserts that another form, dated March 31, 1987 and entered into the computer system on June 4, 1987, was also backdated; Plaintiff denies this.

should be bound by Krager's alleged statement to Richards that backdating was permitted under the terms of the plan.

## II. Background

This case's procedural history spans nearly four years of vigorous litigation by both parties, including a motion to dismiss for failure to state a claim on which relief can be granted, three motions for summary judgment, an appeal to the United States Court of Appeals for the Sixth Circuit, and a non-jury trial. The amount of money at issue is not great, approximately $85,000 in actual damages[3], but it has become clear to the court that the principles at stake are of great concern to the parties. Plaintiff presents himself as an innocent whose only error was to place too much trust in GM. Defendants portray Plaintiff as a cheater—one who tried to get away with the ethical equivalent of betting on the winning horse after the race was over—all to the detriment of his employer.

Plaintiff filed his complaint against GM in Bay County Circuit Court on or about March 1, 1991, pleading three counts: breach of contract/wrongful discharge, deprivation of assets/conversion, and intentional infliction of emotional distress. Defendant timely removed the action to this court on April 9, 1991 on the basis that the action arose under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(e). On June 17, 1991, Defendant filed a motion for summary judgment, arguing that Plaintiff signed a specific agreement making him an employee at will; that the conversion count was preempted by ERISA; that he failed to exhaust his administrative remedies; and that the undisputed facts show that Plaintiff cannot support a claim for intentional infliction of emotional distress. (D. 7). By order dated September 9, 1991 (D. 21), the court granted the defendant's motion for summary judgment on Counts I (wrongful discharge) and III (intentional infliction of emotional distress)[4].

On September 24, 1991, Plaintiff moved to amend his complaint and add a party defendant; the court granted the motion. Plaintiff's First Amended Complaint (D. 24) advanced three counts—breach of fiduciary duties, a claim under 29 U.S.C. § 1140, and deprivation of assets/conversion—and added Defendant General Motors Savings–Stock Purchase Program for Salaried Employees in the United States ("S–SPP"). Plaintiff then moved to withdraw his Count III (D. 31), and the court ordered that the count be dismissed. (D. 32).

On December 6, 1991, Defendants moved to dismiss Plaintiff's remaining counts for failure to state a claim on which relief can be granted. (D. 33). Defendants' motion argued as follows: (1) GM was not acting in a fiduciary capacity when it terminated the plaintiff's employment; (2) ERISA's fiduciary provisions do not provide relief for wrongful discharge claims; (3) Plaintiff's complaint acknowledges Defendants' authority to reject investment elections; (4) as a matter of law, a determination that the S–SPP does not allow backdated retroactive investment decisions cannot be deemed arbitrary and capricious; (5) to the extent Plaintiff asserts that he has been improperly denied S–SPP benefits, he has failed to exhaust the S–SPP appeal procedure; and (6) Plaintiff cannot show that he was exercising any right to which he was entitled under the provisions of the plan. On March 26, 1992, the court granted Defendants' motion to dismiss. (D. 42).

Plaintiff appealed to the Sixth Circuit, which affirmed in part, reversed in part, and remanded. The appeals court affirmed this court's holding that the plaintiff's at-will employment contract left him no cause of action under Michigan law but reversed the dismissal of Plaintiff's ERISA claims.

Plaintiff has raised a genuine issue of material fact under principles of agency law as to whether his transaction activity was

---

3. This case was bifurcated; only the issue of liability is at issue in this phase of the litigation.

4. The court did not dismiss Plaintiff's Count II (deprivation of assets/conversion) as preempted by ERISA but instead allowed the plaintiff to amend his complaint. Plaintiff ultimately voluntarily dismissed his deprivation of assets/conversion claim, stating that it appeared to him that the count was "a state law claim probably preempted by reason of Section 514 of ERISA." (D. 31).

tacitly authorized or approved by defendants; consequently, summary judgment is not proper at this point.[5]

*Richards v. General Motors Corp.*, 991 F.2d 1227, 1236 (6th Cir.1993).

After remand, Defendants filed a motion for summary judgment, on March 29, 1994. (D. 95). Before that motion was resolved, a dispute arose over whether Plaintiff was entitled to a jury trial. Plaintiff's case was consolidated with Robert W. Campbell, Jr.'s case against GM.[6] In an order filed March 31, 1994, the court ruled that the plaintiffs had no right to trial before a jury. (D. 98). The court also granted in part and denied in part Defendants' Motion to Dismiss Count II of Plaintiff Campbell's complaint, which alleged that Defendants breached their fiduciary duty imposed by 29 U.S.C. §§ 1104 and 1105 in terminating his employment. Campbell sought personal damages resulting from his termination and to obtain benefits under the S–SPP representing profits from his own backdated asset transfers. The basis for Defendants' motion was that "Plaintiff cannot maintain a personal action for damages based on a breach of the duty imposed by sections 404 or 405 of ERISA, 29 U.S.C. §§ 1104, 1105." (D. 10, Case No. 93–CV–10122–BC). The court agreed with the defendants and dismissed the portions of Campbell's Amended Complaint which asserted an individual action for breach of fiduciary duties. (D. 98). Plaintiff next filed a motion for advisory jury or reassignment to another judge on April 14, 1994. (D. 99). Defendants opposed the motion, which the court denied after oral argument on May 20, 1994. (D. 24).

Plaintiff did not timely respond to the defendants' March 29, 1994 motion for summary judgment, but on May 9, 1994 he filed his Motion to Dismiss Defendants' Exhaustion Defense. (D. 107). On June 22, 1994, Plaintiff filed his own motion for summary judgment. (D. 120). The court heard oral arguments on the cross motions for summary judgment on October 26, 1994, and on October 28, 1994 the court issued an order denying both motions. (D. 130). Plaintiff filed his Motion to Amend Complaint and Add Party Defendant on October 31, 1994 [7]; in a later submission, Plaintiff's counsel represented that he mailed his motion to amend complaint and add a party defendant on October 28, 1994, before receiving the court's order denying the motions for summary judgment. Plaintiff's motion was granted in part and denied in part: he was permitted to file a second amended complaint containing some, but not all, of the proposed counts but was not permitted to add a new party. Plaintiff's Second Amended Complaint (D. 139) raises three counts: Count I is Equitable Estoppel; Count II is Breach of Contractual Duties; Count III, entitled "Section 1140 Violation," invokes 29 U.S.C. § 1140.

At trial, the court heard the testimony of William L. Cowell, the director of stock plans at GM; John B. Hulett, III, who was during the relevant period first the general supervisor of personnel administration and then the personnel director at the plant where Plaintiff worked; Richard Newberg, the director of audit during the relevant time period; and the plaintiff.

## III. Findings of Fact

### Overview

The court presents the following overview of the most salient material facts. Specific

---

5. Plaintiff presented no such "agency theory" of recovery in his Answer to Defendants' Motion to Dismiss for Failure to State a Claim nor, to the court's recollection, did he do so at oral argument on the motion. Accordingly, the defendants had no occasion to address that theory before this court, nor did the court consider it in its order granting the defendants' motion. Furthermore, the court has reviewed Plaintiff's brief on appeal and found that it does not mention an agency theory. This court can only assume that Plaintiff's counsel proffered the theory at oral argument on appeal.

6. Campbell subsequently agreed to dismiss his case against GM.

7. Plaintiff filed this motion to amend complaint and add a defendant less than one month before trial was set to begin and three years and eight months after initiating the action. Throughout the course of this litigation, Plaintiff's counsel has persisted in a "shotgun" approach to this case, refusing to confine himself to any particular set of allegations or legal theories. Plaintiff's chronic lack of specificity has greatly prolonged this litigation.

findings of fact, some of which are referred to in parentheses in the overview, follow.

In 1987, 1988, and 1989, Plaintiff submitted asset transfer forms which he intentionally "backdated," or filled in a date earlier than he actually signed and submitted the applications. (Fact 67). The reason he backdated the forms was to obtain more favorable asset valuations by capturing uptrends and avoiding downtrends after the fact, including the stock market crash of 1987. (Facts 69 and 74). Nothing in the terms of the plan authorized backdating asset transfer forms. (Fact 15). Plaintiff did not misconstrue any term of the plan to permit backdating; he did not read the prospectus until after this lawsuit was filed (Fact 13), and no portion of the documents incorporated by reference could be reasonably interpreted to authorize backdating asset transfers. (Facts 27, 31, 32, 33, 35, and 41).

Kay Krager, the local plan administrator, did not suggest to Plaintiff the idea of backdating asset transfer forms. (Fact 78). She had no actual authority to alter the rules of the S–SPP or to permit plan participants to backdate applications for asset transfer. (Fact 80–81). GM did not knowingly permit Kay Krager to accept backdated asset transfer forms or to act as having such authority, and it did not hold her out as possessing sufficient authority to backdate. (Facts 83–84). GM was not negligent in its administration of the S–SPP. (Fact. 53).

Plaintiff discussed the process of backdating transfer forms with at least some of the selected few who were allowed by Krager to backdate, but he did not openly discuss the subject with co-workers outside of the select circle of about ten. (Fact 86). The reason he did not discuss the backdating openly is that he realized, or at least suspected, that backdating was not permitted under the rules of the S–SPP and was legally and morally wrong. (Fact 86).

When GM discovered the Plaintiff and others had been backdating asset transfer forms, it terminated their employment and froze their S–SPP accounts. (Facts 94 and 98). GM took these actions because its agents sincerely and justifiably believed that Plaintiff was involved in dishonest and improper behavior. (Fact 96).

*Specific Findings of Fact* [8]

*Robert Richards*

1. Plaintiff was employed by GM from June 14, 1965 until his employment was terminated by GM on April 27, 1990.

2. Plaintiff received a Bachelors Degree in Business Administration in 1965 from Northern Michigan University.

3. Plaintiff received a Masters of Business Administration from Central Michigan University in 1979.

4. From 1981 until he was terminated on April 27, 1990, Plaintiff's duties primarily involved the General Motors Suggestion Plan. At the time he was terminated, he held the position of Suggestion Plan Coordinator, a level six position.

5. When his employment was terminated, Plaintiff was earning approximately $42,000 per year plus benefits.

6. Plaintiff participated in the S–SPP.

*S–SPP*

7. GM established the S–SPP effective October 1, 1955.

8. GM was the administrator of the S–SPP.

9. During 1986 through 1990, information regarding the S–SPP was maintained, and the transactions thereunder were processed by the Metropolitan Life Insurance Company.

10. Plaintiff participated in S–SPP from the time he was first eligible to do so, in 1966, until his employment was terminated.

---

**8.** The court has made extensive findings of fact, some of which may appear at first blush to be unnecessary to the resolution of this case. The court does not regularly seek to resolve facts or opine on law other than that which is necessary to the determination of the case. However, in the interest of judicial economy, in deference to the principle of finality, and in light of the peculiar history of this suit, the court seeks to resolve now, to the extent practical, factual issues which, though not directly placed at issue by Plaintiff at trial, might present themselves at some later phase of litigation. See footnotes five and seven, above.

11. The S–SPP is an employee pension benefit plan under ERISA, 29 U.S.C. § 1102(a)(2)(A).

12. A copy of the S–SPP Prospectus and Program Text is provided to every GM salaried employee annually, usually in December.

13. Plaintiff received a prospectus in each of the relevant years. The first time he read them was after this lawsuit began.

14. The S–SPP Prospectus distributed during each of the relevant years incorporated several documents by reference. The following items were incorporated by reference into the prospectuses for each of the relevant years (1986, 1987, and 1988) and have been admitted into evidence: a booklet entitled "Your GM Benefits" (Exhibit 109), a booklet entitled, "Your '86 Investment Opportunities" (Exhibit 113), and a booklet entitled "Tax Reform '86 and your GM Benefits as a Salaried Employe" (Exhibit 112). A booklet entitled "Modifications in Your GM Salaried Compensation, Policies and Benefits" (Exhibit 110) was incorporated by reference in 1988.

15. No express term of the plan permitted participants to backdate asset transfer forms, and no express term of the plan permitted GM to recover monies gained through backdated asset transfer forms nor through clerical errors or for any other reason.

16. Under the terms of the plan, Richards could contribute up to fifteen percent of his base salary to the program.

17. Participants receive a contribution from GM based on the amount of savings being contributed to the program.

18. During 1987, 1988, and 1989, GM contributed an amount equal to seventy percent of each employee's savings, up to ten percent of his base salary.

19. Throughout his participation in S–SPP, Richards regularly contributed ten percent of his base salary, though he was eligible to contribute as much as fifteen percent of his base salary. He chose ten percent in part because that was the percent at which he maximized GM's contribution to his account. Richards did not increase the percentage of his salary contributed after he began backdating his asset transfer forms.

20. A portion of participant savings (one-half of the first ten percent) is required to be invested in the common stock of GM for two and one-half years. The remainder of each employee's savings and amounts of savings and corporation contributions remaining in the program after the fist two and one-half years, can be invested in any of the investment options available under the program.

21. At the relevant times, there were seven investment options available under the S–SPP: (a) United States government savings bonds, (b) portfolio of diversified United States Government Securities, (c) General Motors $1–2/3 par value common stock, (d) income fund, (e) equity fund, (f) General Motors Class E common stock, and (g) General Motors Class H common stock.

22. In addition to designating investment options at the time the contributions are made, a participant can transfer his or her assets in the S–SPP (other than those assets required to be invested in GM common stocks) from one investment option to another up to four times a year.

23. An S–SPP participant could submit an application for transfer at any time.

24. The plan provides, "Any election to transfer assets shall be irrevocable upon its receipt by the Administrator." S–SPP Text (Dec.1986), page 30.

25. A reasonable person would interpret this provision to mean that a participant may not revoke an election to transfer assets after submitting it to the administrator.

26. The reason for this is clear: an employee would want to revoke his asset transfer if the asset category out of which he transferred later performed more favorably than the one into which he transferred; such a revocation was not permitted under the terms of the plan, probably because it would be too costly for GM.

27. This provision was intended to apply to plan participants, not to bind the administrator.

28. Under the terms of the plan, a transfer of assets is effective on "the fifteenth or last day of the month next following or coincident with the date on which written appli-

cation to the Trustee is received by the Administrator for a transfer of assets." S–SPP Text (Dec.1986), page 25.

29. The word "received" in the above-quoted provision is not defined in the plan.

30. The word "received" in the above-quoted provision is not ambiguous. Received means "to take into possession and control; accept custody of; collect." *Black's Law Dictionary, Sixth Edition* (1990). The Administrator received the written application to the Trustee for benefits when that application was physically delivered to Kay Krager, the local plan administrator, after (or coincident with) having been filled out and signed by the participant.

31. Kay Krager could not have "received" asset transfer forms on a date earlier than the one she actually took possession and control of the completed form.

32. Accordingly, the effective date of an asset transfer could not be earlier than the date on which the Administrator's representative (here, Kay Krager) actually took possession and control of a completed written application to the Trustee seeking to transfer assets.

33. The asset transfer form signed by Plaintiff stated on its face,

The effective date of the election to transfer assets will be the 15th or last day of the month next following or coincident with the date on which this written application is submitted to and signed by the Program Administrator.

One could not reasonably interpret "the date on which this written application is submitted to and signed by the Program Administrator" as being a date before the participant actually filled it out, signed it, and delivered it to the program administrator. Therefore, one could not reasonably expect the effective date of the election to transfer assets to be before delivery of the form to the plan administrator.

34. At the bottom of each asset transfer form is the following message:

TO: NATIONAL BANK OF DETROIT, TRUSTEE

As a participant in the General Motors Savings–Stock Purchase Program, with eligible assets as described above in my account of unmatured and/or matured classes, I hereby elect to transfer to the Option(s) in the increments as indicated above.

I have read all of the transfer of assets provisions as indicated on both sides of this application and understand its contents. I understand my signature below constitutes authorization to transfer assets as indicated above.

Immediately following this message is a long blank; the words, "Signature of Participant," appear immediately under the long blank. Just to the right of the long blank is a smaller blank, under which the word, "Date," appears.

35. Neither the words "Signature of Participant," nor the word "Date," nor the blanks above those words is ambiguous or confusing. The participant is expected to sign his own name in the long blank above the words "Signature of Participant" and to enter the date on which he signed the form in the short blank above the word "Date." A reasonable person would understand that he should enter the current date in a blank above the word "Date" located next to a line for his signature, especially if the paper being signed were known to be time sensitive, such as a request to buy or sell stock. Furthermore, Plaintiff understood that a line over the word "Date" next to the place for his signature should be completed with the current date.

36. It was not the regular practice of GM employees generally to enter a date on their asset transfer forms earlier than the date on which they signed the forms. Only 21 out of over 120,000 regularly did so.

37. The S–SPP further defines the "Date of Valuation" with respect to a transfer of assets, as the effective date of the transfer:

**Date of Valuation**

The term "Date of Valuation" shall mean the date established for each withdrawal, transfer of assets, settlement upon termination of employment, loan, or maturity of a Class, and such date shall be the Effec-

tive Date of Withdrawal, Effective Date of Transfer of Assets, Effective Date of Termination, Effective Date of Loan, or date of maturity of a Class, whichever applies.

S–SPP Text (Dec.1986), pages 24–25.

38. The value of each investment option is published and available to local program administrators and employees shortly after each valuation date. Further, the daily price of GM common stocks was available to employees, including Plaintiff, from the GM Newsline.

39. The GM Newsline is a newspaper, generally one page, distributed to employees of GM. It contains newsworthy information generally about GM. Plaintiff regularly read GM Newsline, in part for its information about the latest values of each investment option.

40. A GM brochure entitled, "Guidelines for Employe [sic] Conduct" provides,

An employee with inside information need not be concerned about the timing of regular stock purchases made in an established pattern or formula. An example would be an investment program administered by a broker where the timing of transactions is outside the control of the insider, such as the General Motors Savings–Stock Purchase Program.

(Exhibit 115, p. 20). This paragraph is in a section entitled "Improper Use of Confidential Information."

41. The value of investment options under the S–SPP is not "confidential information" or "inside information." Furthermore, Plaintiff alone controlled the timing of his asset transfers under the S–SPP. The reference in Exhibit 115 to the S–SPP clearly applies to investment decisions of a particular fund, such as the "income fund" or "equity fund," which are not controlled by participants, rather than asset transfers made by participants. Accordingly, no reasonable person could surmise that the above-quoted provision authorized backdating of asset transfer forms.

42. GM's procedures for administrating the plan provided an "input period" of 45 days until September 1, 1988 and 28 days thereafter. The "input period" was not a part of the plan, and thus it was not contained in any written material given to Plaintiff by GM. The "input period" was meant to set a limit on the amount of time elapsing between the submission of an asset transfer form to the plan administrator and the entry of the transaction into the computer system. Plan administrators were expected to process the transactions as soon as possible but not later than the expiration of the input period.

43. Kay Krager, the local plan administrator, used the "input period" as a "grace period," under which certain of the plan participants could backdate their transactions by up to the length of the grace period.

44. Kay Krager accepted and processed some applications in which the gap between the date on the form and date the form was input into the system exceeded the input period.

45. It was not the usual practice of local plan administrators to enter into the computer system transfer forms which were backdated.

46. The backdated forms appeared proper on their face. They were signed by Richards and Krager and bore the same date next to the signatures. The backdating could be discovered by GM only by comparing the date on which the transaction was entered into the computer (as recorded by the computer) with the valuation date used.

47. Before discovering the practice of backdating, GM had no standard procedure for someone other than the local plan administrator and backup plan administrator to check to make sure that prior valuation dates were not used by plan participants.

48. Approximately 500,000 asset transfers were processed each year.

49. Though GM communicated to its employees that it provided one of the finest and most comprehensive benefit packages in the industry and though GM had provided increasing benefits to Plaintiff throughout his career, GM did not intend to provide as a benefit the opportunity for employees to purchase and sell stock using retroactive valuation dates.

50. Kay Krager had a reputation for honesty and competency, but her invocation of her Fifth Amendment privilege against self-incrimination indicates that she now believes herself to be at least potentially legally culpable for her role in processing backdated asset transfer forms.

51. Though Kay Krager had a reputation for honesty and competency, a representation from her that plan participants could backdate transactions would have seemed strange [9] to a reasonable plan participant, especially one with an MBA.

52. Though GM's benefits were and had always been generous, a reasonable person would have found it strange or unusual that GM would allow its employees to use retroactive stock valuation dates to achieve a guaranteed gain, with a corresponding guaranteed loss to GM. It would seem strange that GM would set up the S-SPP—with all its rules and accompanying administrative burdens and costs—if employee participants could reap guaranteed returns from the transactions any time the market fluctuated. To achieve that result, it would be more sensible and efficient for GM simply to make cash payments to its employees upon demand.

53. GM was not negligent in its administration of the S-SPP. Though GM's procedures obviously failed, GM did not fail to exercise ordinary care in supervising Krager. She had a reputation for honesty, and the corporation acted reasonably in maintaining her in a position of trust.

54. The actions GM took after discovering the backdated transactions were in the best interest of the S-SPP. By preventing a small, discrete group of participants from realizing large gains in violation of program rules, GM acted to stem a possible rising tide of misbehavior and thus to preserve the fiscal integrity of the S-SPP.

*Kay Krager*

55. Kay Krager was the local plan administrator at the GM facility in Bay City where Plaintiff was employed.

56. Kay Krager's supervisor was Nancy Hoffer.

57. Kay Krager and Robert Richards communicated about the practice of backdating his asset transfer forms to take advantage of more favorable past valuations.

58. Each backdated form also bears Kay Krager's signature twice, once as the program administrator and once as a witness to Plaintiff's signature. In every case, Krager used the same date as Plaintiff, which Plaintiff testified was earlier than the true date.

59. Robert Richards and Kay Krager did not have an agreement under which she would keep forms for him in her desk and enter them into the computer system later. Instead, she entered each into the computer system shortly after she received each form from him.

60. Kay Krager invoked her Fifth Amendment privilege against self-incrimination at her deposition for this case.

61. Kay Krager and Robert Richards did not have a close social relationship outside of work.

62. Kay Krager had only a high school education.

63. Kay Krager was a level six employee.

64. Kay Krager was the person designated to answer questions about the features and rules of the S-SPP.

65. Of the employees who participated in backdating asset transfer forms, Kay Krager made the least amount of money from the practice, $10,149.41 over three years, according to GM's calculation. Other participants who backdated made between $70,000 and $600,000.

*Backdated Asset Transfer Forms*

66. In 1987, 1988, and 1989, Plaintiff submitted asset transfer forms which he intentionally "backdated," or filled in a date earlier than he actually signed and submitted the applications.

67. Plaintiff admits to backdating ten asset transfer forms, the first of which is dated August 15, 1987.

---

9. Plaintiff testified that he would think it were "strange" if a clerk at a racetrack permitted him to place a bet on a winning horse after the race had been run.

68. In reconciling Plaintiff's account, GM determined that the next earlier asset transfer form, dated March 31, 1987 and entered into the computer system on June 4, 1987, was also backdated.

69. Plaintiff's reason for backdating the forms was to obtain more favorable asset valuations by capturing uptrends and avoiding downtrends after the fact.

70. Prior to approximately 1985, GM's benefit program provided only for investing in U.S. Government Savings Bonds. When a new system with several investment options was introduced, participants were at first allowed to transfer assets only once a year. Beginning in 1986 or 1987, S–SPP rules were changed to permit transfers four times per year. Therefore, although Plaintiff participated in the S–SPP for more than twenty years before he began backdating, he began to backdate at about the same time that it first became significantly advantageous under the plan to do so.

71. GM determined that Plaintiff gained $75,042.08 (plus interest, for a total of $84,966.49) from the backdated transactions.

72. Gains to Plaintiff from backdated transactions resulted in losses to GM of the corresponding amount.

73. Plaintiff knew that one is not ordinarily entitled to purchase stock using past valuation dates. Indeed, the stock market is premised on the concept that market participants assume the risk of fluctuations.

74. Plaintiff's backdating of asset transfer forms allowed him to avoid much of the negative impact of the stock market crash of 1987.

75. Approximately 120,000 salaried GM employees participated in S–SPP during the relevant time period, and only 21 of them had a significant number of "late transactions" (i.e., transactions which were entered into the computer system significantly later than the dates on which they were purportedly signed and submitted to the plan administrator).

76. Approximately 250–300 GM facilities participated in S–SPP. There was one administrator plus one backup in each facility. Only two facilities had a significant number of late transactions.

77. Plaintiff's submission of backdated asset transfer forms did not directly harm the S–SPP or other plan participants. It did, however, harm GM to the same extent that it benefitted Plaintiff.[10] Thus, it harmed the S–SPP indirectly.

*Kay Krager's Authority*

78. Plaintiff's testimony that Kay Krager suggested to him the idea of backdating the asset transfer forms is not credible. Richards's testimony as a whole was less than believable, and several facts about Krager militate against a finding that the backdating was her idea. Of all the plan participants who participated in backdating asset transfer forms, Kay Krager made the least amount of money. She was essentially a clerical employee with only a high school education. Accordingly, Plaintiff has failed to establish that Kay Krager suggested the idea of backdating to him. He has established, though, that she participated in the backdating for Plaintiff's benefit.

79. Kay Krager was the "contact point" for the S–SPP. She was designated by GM as an appropriate person to seek out for S–SPP forms or to ask questions about the S–SPP, and she had authority to communicate with employees regarding the filling out of forms and the like.

80. Kay Krager had no actual authority to alter the rules of the S–SPP.

81. Kay Krager had no actual authority to permit plan participants to backdate applications for asset transfer.

---

10. The court notes that if each of GM's 120,000 salaried employees participating in S–SPP backdated transactions and "earned" the same amount that Plaintiff did, it would cost the corporation $9 billion every three years, or approximately $3 billion per year, in addition to current costs to GM of the program. GM's North American Operations earned $690 million in 1994, and that was the first calendar-year profit in five years for its domestic automaking operations. Thus, even if only 9,200 salaried workers—less than 8% of the total number of participants—backdated forms and thereby claimed the same amount of money as the plaintiff, it would cost GM enough to consume the entire profits of GM's North American Operations in 1994.

82. A reasonable plan participant would have known that Krager had no authority to alter verbally the rules of the S–SPP.

83. GM did not knowingly permit Kay Krager to accept backdated asset transfer forms or knowingly permit her to act as having such authority.

84. GM did not hold Kay Krager out to its employees as possessing sufficient authority to permit plan participants to backdate asset transfer applications or to enter in the blank on the form calling for "date" any date other than the one on which the form was actually signed. Language on the first page of the prospectus received every year by Plaintiff cautioned:

> No person is authorized to give any information or to make any representations not contained or incorporated by reference in this Prospectus, and any information or representation not contained or incorporated by reference herein must not be relied upon as having been authorized by General Motors Corporation.

Though Krager was designated as the person to whom to address questions about the plan, her job was essentially clerical and nondiscretionary. She was not intended to and could not reasonably be perceived as holding discretion or authority to change or supplement the plan rules.

85. The authority to give instructions as to how to complete applications cannot reasonably said to include the authority to falsify—backdate—the forms, any more than it would include the authority to permit an applicant to use a false name or social security number on the form.

*Robert Richards's Knowledge*

86. Robert Richards testified that he did not discuss the backdating procedure with anyone other than Krager, but this testimony is not credible and is not accepted by the court. The court finds it more likely that Richards did indeed discuss the process of backdating transfer forms with at least some of the selected few who were allowed by the local administrator to use such a ploy. The method was too good—too profitable—to have been ignored among those "in the know." The court does believe, however,

that the plaintiff did not openly discuss this subject with co-workers outside the select circle of about ten. The reason stated by plaintiff was that the subject "did not come up." This testimony is not credible and is not accepted by the court. The absence of discussion amounts to indirect evidence of the plaintiff's knowledge that the false dating system was morally and legally wrong. If Plaintiff thought that the backdating system was accepted by the company, there is no reason for Plaintiff to have avoided broad discussion of the fact or even publication of it in the company newsletter. The results to him, including substantial avoidance of the ill effects of the "Crash of '87," would be absolutely astounding to any sensible and reasonably intelligent college graduate, especially one with a masters degree in business administration. There is no hypothesis consistent with innocence of mind which could satisfactorily explain an intelligent person's silence about such a lucrative program. If Plaintiff thought it was legitimate, talk would have ensued; only if he thought it wrong would he have remained silent.

87. Robert Richards's testimony that he did not hear any of his coworkers remark about the stock market crash of 1987 is incredible.

88. Robert Richards's testimony that he did not discuss backdating asset transfer forms with Robert W. Campbell, Jr., who made approximately $600,000 from backdated transfers and with whom Richards golfed weekly for ten years, is incredible.

89. Robert Richards's testimony that he believed there was nothing wrong with submitting backdated asset transfer forms is incredible. Richards's professed belief in the legitimacy of his actions is contrary to common sense and is belied by his testimony that he did not discuss this very valuable benefit with any of his coworkers, even in the face of a major stock market crash.

90. Plaintiff counsel's suggestion that if Plaintiff intended to cheat the S–SPP, he would have increased his S–SPP contributions by 50% (from 10% to 15%) of his wages is rejected. The court finds it more than equally likely that Plaintiff chose not to in-

crease his level of contributions in order to avoid detection of what he knew or suspected to be improper activity.

91. Plaintiff did not believe that Krager had the necessary authority to authorize him to backdate asset transfer forms.

*GM's Response to Discovering Backdated Transactions*

92. GM first discovered that some employees were backdating transactions as a result of a comment by an uninvolved former GM employee at a cocktail party. (Ex. 155, 158).

93. GM then developed with Metropolitan Life Insurance Company a computer program designed to detect transactions entered into the system significantly late.

94. All 21 employees who were determined by GM to have engaged in the transfer of S–SPP assets using retroactive valuation dates, including Plaintiff and Kay Krager, the local plan administrator, were discharged from employment.

95. GM terminated Plaintiff's employment because its agents believed that the plaintiff's backdated asset transfers were an attempt to gain financial advantage to the detriment of the corporation and in violation of the applicable rules.

96. GM and its agents sincerely and justifiably believed that Plaintiff was involved in dishonest and improper behavior and that that behavior warranted termination of his employment.

97. Plaintiff pursued GM's Open Door Policy to contest his discharge. On October 4, 1990, Vice President Richard F. O'Brien advised Plaintiff that his discharge was proper and would not be rescinded.

*Reconciliation of Plaintiff's S–SPP Account*

98. Once Defendants discovered that assets had been transferred using retroactive valuation dates, the accounts in question were frozen and a reconciliation was performed to correct the account balances and remove gains and earnings thereon which had been achieved by using retroactive valuations.

99. GM's response to discovering the backdated transactions—immediately sus-pending the employees involved and freezing their S–SPP accounts—was reasonable under the circumstances.

100. GM, with the assistance of Metropolitan Life Insurance Company, identified improper transactions and correlated the transactions to the purchase and sale of an asset category.

101. In each case where a purchase and sale could be identified, the gain from the transaction was computed, with interest, and such amounts were deducted from the participant's S–SPP account.

102. In Plaintiff's case, eleven transactions resulted in eight purchases and sales of assets. Gains were computed totalling $75,042.08. After adding interest to the gain realized, a total sum of $84,966.49 was deducted from Plaintiff's S–SPP account.

103. Dividends and GM contributions to Plaintiff's account were not deducted.

## IV. Conclusions of Law

The court's conclusions of law will be presented in three sections, corresponding to the three provisions of ERISA under which Plaintiff brings his claims. Counts I and II of Plaintiff's Second Amended Complaint (Equitable Estoppel and Breach of Contract) each invoke both 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3). Count III invokes 29 U.S.C. § 1140.

This section also includes an application of the law to the facts set out above. Statements of fact in this section are generally followed by a citation to one or more numbered findings of fact from the previous section in the following manner, (Fact ——). Other factual findings or mixed findings are stated, mostly in an effort to apply law to the facts of the case.

### A. 29 U.S.C. § 1132(a)(1)(B)

Section 1132(a)(1)(B) provides that a civil action may be brought by a participant or beneficiary

to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify

his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). Thus, to recover under this section, Plaintiff must show that the money he gained from transfers involving backdated transactions, which Defendants removed from his account, was "due to him under the terms of his plan" or that Defendants' reconciliation of his account violated the terms of the plan. In some sense, these are two sides of the same coin. If Plaintiff was entitled to the money under the terms of the plan, then certainly the reconciliation violated the terms of the plan. However, the converse is not true. If it is determined that Plaintiff was not entitled to the money under the terms of the plan, it must still be decided whether the reconciliation violated the terms of the plan, i.e. whether GM took back too much money. Thus, the second inquiry—whether the reconciliation of Plaintiff's account violated the terms of the plan—need only be reached if the first inquiry—whether the funds removed from Plaintiff's account were "due to him under the terms of the plan"—is answered in the negative.

● *Were the funds removed from Plaintiff's account due to him under the terms of the plan?*

The first inquiry is whether the funds removed from Plaintiff's account were due to him under the terms of the plan. The court concludes that they were not.

GM's determination that Plaintiff was not entitled to the gains resulting from backdated transactions is subject to de novo review by this court. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989) and *Richards v. General Motors Corp.*, 991 F.2d 1227 (6th Cir.1992).

In this case, no express term of the plan was violated by the defendants; the plan simply does not speak to the situation that arose in this case. No express term of the plan permitted Plaintiff to backdate asset transfer forms to obtain more favorable stock market valuations (Fact 15), and the "defendants had no *express* contractual obligation to make plaintiff's back-dated transfer applications effective as of the dates he requested." *Richards*, 991 F.2d at 1231. Plaintiff argues *sub silentio* that the contractual duty which forms the basis of his § 1132(a)(1)(B) claim need not be explicit but can be shown through the common law of apparent authority, ratification, or equitable estoppel.

*Availability of Apparent Authority and Ratification Theories*

The Sixth Circuit has not directly addressed whether benefits may be "due to [a participant] under the terms of his plan" within the meaning of § 1132(a)(1)(B) where the alleged right in question arises not from the express terms of the plan but through the common law doctrines of apparent authority or ratification. There is substantial support for the position that those theories are unavailable in some or all cases, but there is also support for the contrary position, most notably by implication in the Sixth Circuit's opinion in *Richards v. General Motors Corp.*, 991 F.2d 1227 (6th Cir.1992).

■ The argument for the position that "the terms of the plan," as provided in § 1132(a)(1)(B), means the written terms of the plan and not terms implied through the theories of apparent authority and ratification, may be succinctly stated as follows: 29 U.S.C. § 1132(a)(1)(B) provides for recovery of benefits "due to [a participant] under the terms of his plan." ERISA expressly requires that employee benefit plans be "established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).[11] The general rule is that the written provisions of an ERISA plan cannot be altered by oral representations. "If the oral policy does not qualify as a plan, then the statements are no more than oral representations. It is well established that the written terms of a plan may not be modified or superseded by oral assurances or other extrinsic evidence."

---

11. *Cf. Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178, 185 (6th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993) ("ERISA does not require a formal, written plan") (*citing Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982)). There is no dispute in this case that the S–SPP is a formal, written plan under ERISA; the question is whether the S–SPP's written terms can be modified by the oral representations of Kay Krager.

*Gordon v. Barnes Pumps, Inc.* 999 F.2d 133, 137 (6th Cir.1993), *citing Boyer v. Douglas Components Corp.*, 986 F.2d 999 (6th Cir. 1993). Therefore, apparent authority and ratification, which rely on oral representations and/or inaction, cannot provide the basis for modification of the written terms of the plan. Accordingly, apparent authority and ratification theories cannot provide evidence of the "terms of the · plan" under § 1132(a)(1)(B).

As discussed further below, the Sixth Circuit fashioned a limited exception to this rule in *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir.1991). In *Armistead*, the court held that equitable estoppel was available as a theory of recovery under 29 U.S.C. § 1132(a)(1)(B) in actions relating to welfare plans, but not in actions involving pension plans. If *Armistead* applies to apparent authority and ratification, as well as equitable estoppel, then these theories are available for plaintiffs whose claims involve welfare plans, but not for plaintiffs whose claims involve pension plans. However, in *Richards v. General Motors Corp.*, 991 F.2d 1227 (6th Cir.1993), the court seemed to assume, without analysis, that the plaintiff could use the theories of apparent authority or ratification to imply additional terms of the plan.[12] The court introduced the opinion with the statement, "The most difficult issue on appeal is whether under agency principles of 'apparent authority' GM's local plan administrator had the authority to bind GM, her principal, to this unusual construction of the ERISA plan." *Id.* at 1229. However, the court did not cite the statute or any case for the proposition that an oral statement could become a "term of the plan" under § 1132(a)(1)(B) through the theories of apparent authority or ratification. *Richards* did not cite *Armistead* and did not discuss whether the S–SPP is a welfare plan or a pension plan. Accordingly, the relationship between the two cases is unclear.

Though this court has significant reservations as to whether § 1132(a)(1)(B) contemplates the use of apparent authority or ratification theories to show "the terms of [the] plan" where the plan in question is a comprehensive written document, I follow the Sixth Circuit's *sub silentio* suggestion in *Richards* that those theories are available.

### Apparent Authority

 Kay Krager did not have apparent authority to permit Plaintiff to backdate his asset transfer forms in order to secure guaranteed gains through retroactive stock market transactions. The Sixth Circuit has defined apparent authority as follows:

Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*Tosco Corp. v. Federal Deposit Ins. Corp.*, 723 F.2d 1242, 1248 (6th Cir.1983). The Sixth Circuit further explained, "Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency." *Id.* at 1248–1249. Two important facts must be clearly established before the rule of ostensible authority to act as agent may be conferred:

(1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and

(2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.

*Id.* Finally, the apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent. *Id.* A principal is responsible for the acts of an agent within `her apparent authority only where the principal itself "by its acts or

---

12. This court notes that Plaintiff's appeal brief did not address the issue and, in fact, did not use the terms "apparent authority" or "ratification." *See* footnote 5, above.

conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Id.* Furthermore, objective reasonableness of the third party's reliance must be evaluated. The liability of the principal is determined, not merely by what was the apparent authority of the agent, but "by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by [its] acts under the circumstances conferred upon [its] agent." *Id.*

■ Plaintiff simply fails to meet this test. GM did not knowingly permit Kay Krager to accept backdated asset transfer forms. (Fact 83), and it did not hold Kay Krager out as possessing the authority to change the rules of the S–SPP. (Fact 84). On the contrary, as soon as GM discovered what Krager was doing, she was fired. (Fact 94). Furthermore, Plaintiff's professed belief that Krager had the necessary authority is neither objectively nor subjectively reasonable. A reasonably prudent person, using diligence and discretion, in view of GM's conduct, would not "naturally suppose" Krager to have the authority to permit backdated transactions (Facts 82 and 84), and the court finds that Plaintiff did not, in fact, believe that Krager had the necessary authority. (Fact 91). Therefore, Krager did not have apparent authority to permit, on behalf of GM, Plaintiff to reap the benefits of backdated asset transfers.

Finally, the court reiterates its rejection of Plaintiff's claim that Krager suggested to him the idea of backdating the asset transfer forms. (Fact 78).

### Ratification

Defendants did not ratify—either explicitly or by silence—Kay Krager's statements to Plaintiff that he could backdate his asset transfer forms. There was no explicit ratification because the confirmation participants received from Metropolitan Insurance Company was not an approval of the transfer by GM. The confirmation was titled "Transfer of Assets Receipt" and stated, "In accordance with your request, the following transfer has been processed effective [date]."

There is no statement that the transaction is finally and permanently approved by GM. In light of the tremendous number of S–SPP transactions handled by Metropolitan Insurance Company—approximately 500,000 per year—it would be unreasonable to conclude that each application was individually scrutinized for errors and "approved" by GM in the short time between its submission to the local plan administrator and the issuance of the confirmation.

■ There was no ratification by silence. A principal may ratify an agent's conduct by silence only if the principal failed to repudiate the agent's conduct within a reasonable time after learning of the conduct. "[O]ne essential prerequisite to a principal's ratification of an unauthorized act is that at the time of the ratification the principal have knowledge of all material facts." *Capital Dredge and Dock v. City of Detroit,* 800 F.2d 525, 530 (6th Cir.1986). *Capital Dredge & Dock* was a diversity case applying Michigan law, but the Sixth Circuit cited the Restatement (Second) of Agency §§ 91 and 98, as well as a Michigan Supreme Court case, for the legal principle quoted above, and this court adopts its analysis. The Northern District of Illinois applied the same principle in *Rouse Woodstock, Inc. v. Surety Federal Savings & Loan Ass.,* 630 F.Supp. 1004 (N.D.Ill.1986), stating,

> It is true that as a general rule innocent third parties who rely on apparently valid indications of authority should not bear the loss stemming from the acts of a faithless agent. A principal who places an agent in a position of authority normally must accept the consequences when that agent abuses that authority. The operative word in the doctrine, however, is 'innocent.' If the party knows or has reason to know that the agent is faithless, the right to rely vanishes. [internal citations omitted].

*Id.* at 1010–11. The third party in this case—Plaintiff—knew or had reason to know that Krager was being faithless to GM in helping him use past valuations for stock transactions so he could reap a guaranteed gain at the expense of GM. In contrast, GM did not know "all material facts." Though GM could have, in theory, checked each local

plan administrator's computer-generated records to determine if she was violating the S–SPP procedures, it did not do so until it received a "tip" that some local plan administrators were permitting backdating of asset transfer forms. GM clearly viewed Krager's action as a fraud against the company and fired her as soon as it became aware of her actions. Accordingly, GM could not be said to have ratified Krager's conduct by silence.

## Equitable Estoppel

■ As noted above, in *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir.1991), the Sixth Circuit held that the doctrine of equitable estoppel could be applied in actions under 29 U.S.C. § 1132(a)(1)(B) despite the general principle that oral representations cannot alter the written provisions of the plan.

The *Armistead* court adopted in part and distinguished in part *Nachwalter v. Christie*, 805 F.2d 956 (11th Cir.1986), a case involving a pension plan in which the Eleventh Circuit declined to create a common law doctrine of estoppel permitting oral modification of ERISA-protected plans.

> The [*Nachwalter*] court cogently reasoned that if oral modifications were permitted, the rights of other plan participants would be jeopardized by unrecorded oral agreements between plan officers and favored plan participants. In such circumstances, 'employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.' In sum, permitting oral modification of pension plans would undermine the security of pension rights, the goal Congress sought to serve by requiring that they be put in writing.

*Armistead*, 944 F.2d at 1299 (internal citations omitted), *citing Nachwalter*, 805 F.2d at 959–60. *Armistead* created an exception to the *Nachwalter* analysis (and the general principle of no estoppel) for welfare benefit plans, such as health insurance. *Armistead* concluded that the reasoning in *Nachwalter*

> applies primarily to cases involving pension plans and is much less cogent when welfare benefit plans are at issue. The

reason is that pension benefits are typically paid out of funds to which both employers and employees contribute. Contributions and pay-outs are determined by actuarial assumptions reflected in the terms of the plan. If the effective terms of the plan may be altered by transactions between officers of the plan and individual plan participants or discrete groups of them, the rights and legitimate expectations of third parties to retirement income may be prejudiced.

> This is not necessarily the case with insurance benefit plans. Typically the employer pays policy premiums out of its own assets, perhaps with a contribution for the employee. The actuarial soundness of a fund, which might be depleted if strict vesting and accrual requirements were not observed, is not an issue where a plan of this description is involved. We conclude therefore, that in such a case, the purpose of Congress in enacting 29 U.S.C. § 1102(a) would not be frustrated by recourse to estoppel principles, which are generally applicable to all legal actions.

*Armistead*, at 1300. In short, *Armistead* distinguished between actions involving insurance benefit plans or welfare plans, in which equitable estoppel claims are allowed under § 1132(a)(1)(B), from actions involving pension plans, in which equitable estoppel claims are not allowed under § 1132(a)(1)(B).

This court concludes that the S–SPP is more like a pension plan than an insurance benefit plan. Accordingly, equitable estoppel is not available to Plaintiff as a theory of recovery under § 1132(a)(1)(B). One factor *Armistead* used to distinguish the two types of ERISA plans is the source of contributions. *Armistead* noted that "pension benefits are typically paid out of funds to which both employers and employee contribute," while with welfare plans, "[t]ypically the employer pays policy premiums out of its own assets, perhaps with a contribution from the employee." *Id.* at 1300. As with pension plans, both employers and employees contribute to S–SPP accounts. Second, as with pension plans, the rights and legitimate expectations of third parties to retirement income may be prejudiced if the effective

terms of the plan may be altered by transactions between plan officers and individual plan participants or discrete groups of them. The negative effect of such transactions on third parties is more attenuated with the S–SPP than in a case in which the money to pay a judgment in favor of the plaintiff comes directly from the plan, but it is not negligible, nevertheless, because of the close financial relationship between GM and the plan. If, through equitable estoppel, GM were required to pay the plaintiff for oral representations made in variation from the plan language, there would be a negative impact on GM share prices. Because S–SPP participants are required to invest a portion of contributions in GM stock (Fact 20), they would also be subjected to a negative impact. The "actuarial soundness" of the fund could be called into question if some participants could extract large recoveries from GM on the basis of oral representations, and those relying on the written terms of the plan would suffer correspondingly. The court holds that equitable estoppel is not available to the plaintiff as a theory of recovery under § 1132(a)(1)(B) in this case.

■ Assuming, *arguendo,* that such a theory were cognizable, the court concludes that Plaintiff would not be entitled to recover under it. The elements of equitable estoppel are:

a. conduct or language amounting to a representation of material fact;

b. awareness of the true facts by the party to be estopped;

c. an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;

d. unawareness of the true facts by the party asserting the estoppel; and

e. detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Tregoning v. American Community Mutual Ins. Co.* 12 F.3d 79, 83 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994), *citing Armistead v. Ver-*

*nitron Corp.,* 944 F.2d 1287, 1298 (6th Cir. 1991).

■ The first element, "a representation of material fact," requires the plaintiff to prove that Kay Krager asserted to him that GM approved of the backdating process, thus asserting or implying that such a backdating process was an allowable alteration of the plan's terms, which did not permit backdating or even contain any reference to an "input period" or "grace period." This the plaintiff has failed to prove. The plaintiff succeeded only in establishing that he and Krager communicated about the backdating process (Facts 57 and 78), not that it was she who suggested the procedure to him. In Facts 55–65, 78–91 and elsewhere, the court specifically finds that it is more likely under the circumstances of this case that the procedure—providing advantageously false investment dates which would nonetheless be accepted by the computer system—was discovered or developed by others, and Krager, knowing it was wrong, simply went along with the implementation of it.

Even assuming that a representation by Krager sufficient for the first element had been proven by plaintiff, the third, fourth and fifth elements are not proven, so his claim must fail. The third element is not proven because Plaintiff has not shown an intention on the part of GM that he act on Krager's representation that he could backdate his forms, and he has not demonstrated conduct toward him such that he has a right to believe that the GM's conduct is so intended. Indeed, the facts show that GM promptly dismissed Plaintiff after learning of the backdating. The fourth element, unawareness of the true facts by plaintiff, is not shown from this evidence (Facts 66, 67, 69, 73, 86, 87, 88, 89, 90, 91). The fifth element is unfulfilled because Plaintiff did not rely to his detriment on Krager's assertions. Though his backdating was eventually discovered and the amounts gained as a result thereof recovered, Plaintiff did not lose any money as a result of Krager's assertions. Money to which he may have thought himself entitled was simply recouped. Indeed, because the reconciliation left the dividends and GM's contribution in his account, Plaintiff

may well have actually gained from Krager's alleged advice. Furthermore, any reliance by Plaintiff on Krager's representations was not justifiable. (Facts 82–85).

The court determines that the funds removed from Plaintiff's account were not due to him under the terms of the plan. Accordingly, it is necessary to address the second question, whether the reconciliation of Plaintiff's account violated the terms of the plan, given that Plaintiff was not entitled under the terms of the plan to gains resulting from backdated transactions.

● *Did the reconciliation of Plaintiff's account violate the terms of the plan?*

■ This court's determination of whether GM's reconciliation of Plaintiff's account violated the terms of the plan subjects GM's action to review under an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). The Sixth Circuit further explained the appropriate standard of review in *Anderson v. Great West Life Assurance Co.,* 942 F.2d 392, 395 (6th Cir.1991). "[U]nder *Firestone,* a plan administrator can be given discretionary authority. As the Court explained, 'a trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable.'" *Id., citing Firestone,* 489 U.S. at 111, 109 S.Ct. at 954. "It is quite consistent with the teachings of *Firestone* that an administrator might be given discretion with respect to some decisions but not others, or given discretion on some decisions to be exercised within certain bounds. If so, the administrator's decisions on issues involving the exercise of that discretion are properly reviewed under a deferential standard, while all other decisions are properly reviewed *de novo.* A plan administrator has exactly the amount and type of discretion granted by the plan, no more, and no less." *Anderson,* 942 F.2d at 395. The Sixth Circuit noted, when this case was before it on appeal, "The savings plan provides at 45 that

'[t]he Management Committee of the Corporation, or its delegate, shall have responsibility for the day to day operation, management, and administration of the Program, including full power and authority to construe, interpret, and administer this program.'" *Richards v. General Motors Corp.,* 991 F.2d 1227, 1232 (6th Cir.1993). Accordingly, this court finds that, although the de novo standard applies to Plaintiff's alleged entitlement to the gains from the backdated transactions, the arbitrary and capricious standard applies to determining the propriety of the reconciliation. Because the plan confers great discretion on GM as administrator of the S–SPP, a deferential standard of review is appropriate under 29 U.S.C. § 1132(a)(1)(B) in this context.[13]

■ GM's reconciliation of Plaintiff's account was not arbitrary and capricious. On the contrary, the decision to reconcile Plaintiff's account, after correctly determining that he was not entitled under the plan to some of the money in his account, was consistent with GM's fiduciary duty to the plan as a whole.[14] Furthermore, GM utilized a rational and fair method of determining the amount to be recovered. GM was forced to presume the date on which the forms were actually submitted because the plaintiff and Krager obscured the true date, and GM's presumption that the form was received the same day it was entered into the computer system was rational. Indeed, this assumption is fully consistent with Plaintiff's testimony at trial, even though GM could not have been expected to have as much information at the time of the reconciliation. (Fact 59). In short, GM acted sensibly and in the best interest of the S–SPP; its actions were neither arbitrary nor capricious.

**B. 29 U.S.C. § 1132(a)(3)**

■ Section 1132(a)(3) authorizes a civil action

by a participant, beneficiary, or fiduciary
(A) to enjoin any act or practice which

---

**13.** The court rejects Plaintiff's suggestion that "the burden of proof is upon the Defendants to justify their subsequent conduct of discharging Plaintiff and reconciling his S–SPP account." As

the plaintiff in this action, Richards bears the burden of proof.

**14.** *See* footnote 10, above.

violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

In *Mertens v. Hewitt Associates,* —— U.S. ——, ——, 113 S.Ct. 2063, 2068, 124 L.Ed.2d 161 (1993), the United States Supreme Court held that money damages are not recoverable under this section, only *equitable* relief, such as injunction, restitution, and the like.

Despite *Mertens,* however, some federal courts have broadened the scope of relief available under 29 U.S.C. § 1132(a)(3). As recently as January 31, 1995, the Sixth Circuit held that back pay and front pay can be considered equitable relief under *Mertens. Schwartz v. Gregori,* 45 F.3d 1017 (6th Cir. 1995).

This court holds that Plaintiff is not entitled to equitable relief under § 1132(a)(3), regardless of how "equitable relief" is defined, because the defendants' actions did not violate the terms of the plan or ERISA and because he does not come to the court with "clean hands." Rather, Plaintiff knew or should have known that backdating asset transfer forms is contrary to the S–SPP rules and, as a matter of ethics, is simply wrong.

### Fiduciary Duty Claim

It appears from Plaintiff's Second Amended Complaint that he has abandoned his claim for equitable relief for breach of fiduciary duty in light of this court's March 31, 1994 order holding that no individual action for breach of fiduciary duty can be brought under § 1132(a)(3) [15] and the Sixth Circuit's holding agreeing "that § 1132(a)(2) (which refers to § 1109) provides for relief only to a *plan,* not to participants or beneficiaries." *Richards,* 991 F.2d at 1231.

Even if an individual action for breach of fiduciary duty were available under §. 1132(a)(3), though, Plaintiff would be unable to recover in this case. The Sixth Cir-

cuit has stated that "a breach of contractual duty is required for liability to attach under § 1132(a)(3)," *Id.,* and this court has determined that the defendants did not breach any contractual duty—either express or implied—in this case. Furthermore, Plaintiff's own lack of "clean hands"—his participation in what amounted to a fraud against GM—precludes his recovery of equitable relief under § 1132(a)(3).

### C. 29 U.S.C. § 1140

Count III alleges a violation of 29 U.S.C. § 1140, which provides

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, ..., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. ... The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

In order to recover under 29 U.S.C. § 1140, Plaintiff must show that the money he gained from transfers involving backdated transactions which Defendants removed from his account was "due to him under the terms of his plan" or that Defendants' reconciliation of his account violated the terms of the plan. Because the court holds that the money was not due to Plaintiff under the terms of the plan and that Defendants' reconciliation of Plaintiff's account did not violate the terms of the plan, further analysis of Count II is unnecessary. Even if Plaintiff were entitled to the money from the transactions in question under the terms of the plan, though, § 1140 would provide him no cause of action because GM's termination of Plaintiff's employment and reconciliation of his account were taken in the good faith belief that Plaintiff had committed a fraud against the company.

---

**15.** This holding was directed toward a motion by GM to dismiss a fiduciary duty claim brought by Robert W. Campbell, Jr. The motion was brought before the Campbell and Richards cases were consolidated but decided thereafter.

Count II alleges violation of 29 U.S.C. § 1140, which forbids termination in retaliation for the exercise of a lawful right under any benefit plan. "[T]o avoid summary judgment on a section 1140 claim, a plaintiff must show the existence of a genuine issue of material fact that there was: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992). "[A] plaintiff must show that an employer had a specific intent to violate ERISA." *Id.* While a plaintiff need not show that the employer's sole purpose in discharging him was to interfere with his pension benefits, he must show that it was a motivating factor in the decision. *Id.*

Plaintiff has failed to show that GM had a specific intent to violate ERISA. On the contrary, the proofs at trial show that GM terminated Plaintiff's employment and reconciled his S–SPP account because its agents sincerely, honestly, and justifiably believed that Plaintiff was involved in a fraudulent scheme to circumvent the rules of the S–SPP for his financial gain and GM's loss. (Fact 96).

Plaintiff has failed to meet any of the three requisite elements under § 1140 set forth in *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992). GM's conduct was not prohibited by the plan; its actions were not taken for the purpose of interfering with Plaintiff's benefits under ERISA; and Plaintiff was not entitled to the money under the plan. Accordingly, the defendants are entitled to judgment on Count III.

### V. Summary and Order

Plaintiff has failed to meet his burden of proof on the claims raised in his Second Amended Complaint. Accordingly, judgment shall be entered in favor of the defendants.

IT IS SO ORDERED.

### JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law entered this date,

IT IS ORDERED AND ADJUDGED that judgment be, and hereby is **GRANTED** in favor of Defendants and against Plaintiff; and

IT IS FURTHER ORDERED AND ADJUDGED that this action is **DISMISSED**.

IT IS SO ORDERED.